THE HENRY LAW FIRM
By: Todd Edward Henry, Esquire
PA Atty. ID #79704
1500 Walnut Street, Suite 1060
Philadelphia, PA 19102
(215) 545-7100 (office)
thenry@thehenryfirm.biz
dlombardo@thehenryfirm.biz

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**
**(Scranton)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | Case #3:24-cr-00171-MEM-001 |
| WEI FU | ) | |

# DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

# TABLE OF CONTENTS

PAGE

Introduction ........................................ 1

I. Personal History and Characteristics ........................................ 1

A. Mr. Fu's Early Life in Communist China ........................................ 1

B. Higher Education and Professional Career ........................................ 1

C. Violent Assault and Medical Hardships ........................................ 3

D. Recently Diagnosed Untreated Mental Health Conditions ........................................ 3

1. Post-Traumatic Stress Disorder (PTSD) ........................................ 4

2. Autism Spectrum Disorder (ASD) ........................................ 5

(a) ASD Origins ........................................ 5

(b) ASD in 1990s China ........................................ 6

(c) ASD as it relates to Wei Fu ........................................ 8

E. Residual Effects of Untreated Mental Health Disorders ........................................ 11

1. Profound Isolation and Impaired Coping Mechanisms ........................................ 11

2. Development of Compulsive Hoarding ........................................ 11

II. Sentencing Factors Under §3553(A) ........................................ 12

A. Nature and Circumstances of the Offense ........................................ 13

B. Sentencings in CSAM Cases ........................................ 16

C. Prior Sentences by the Court ........................................ 17

D. U.S. v. Goff and U.S. v. Lychock ........................................ 18

E. U.S. v. Grober ........................................ 19

1. Many Courts have concluded that sentencing ranges produced by U.S.S.G. §2G2.2 are unreasonably high ........................................ 19

2. U.S.S.G. §2G2.2 was not developed pursuant to the Sentencing Commission's characteristic institutional role. ....... 21

III. Other Factors ....... 23

A. Impact of Plea Agreement ....... 23

B. Vulnerability in Prison ....... 24

C. Disproportionate Severity of Incarceration and Ineligibility for Relief ....... 25

D. Deportation to China ....... 26

1. Mandatory Surveillance and "Key Population" Tracking ....... 26

2. Lifetime Professional and Employment Bans ....... 27

E. Changes in Life Circumstances Since the Offense ....... 28

F. Very Low Risk of Recidivism ....... 30

IV. Conclusion ....... 31

Certificate of Service ....... 34

## *ATTACHMENTS*

*Alexander Westphal, MD, PhD – report, 2-21-2026* ....... *001*

*Lucien Thomsen, LCSW, CSAT-S, CMAT- CD, CSOTS – summary, 7-9-26* ....... *033*

*Statement from Wei Fu* ....... *035*

*Character letter from Yang Jiang* ....... *037*

*Character letter from Yun Ling* ....... *039*

## INTRODUCTION

The defendant, Wei Fu, by and through his attorney, Todd Edward Henry, respectfully submits this Sentencing Memorandum and Motion for Downward Variance to assist the Court in determining a reasonable sentence pursuant to 18 U.S.C. §3553(a).

Mr. Fu is a 40-year-old Asian male, born and raised in the Peoples Republic of China ("PRC"); educated under the Chinese state school system. He came to the United States to further his education and build a better life. Mr. Fu has no criminal record and no negative contact with law enforcement. He was, however, a victim of a violent robbery while living in New Jersey. He immediately reported the incident to local authorities and remained fully cooperative throughout the entire investigation. Recently, Mr. Fu was diagnosed with Post-Traumatic Stress Disorder (PTSD) because of the assault along with Autism Spectrum Disorder (ASD).

On July 11, 2024, Mr. Fu was arrested in this case. He was placed on home detention on July 19, 2024. Mr. Fu has been in full compliance with the Court's conditions of pretrial release and has had no violation reports or noncompliance issues.

## I. Personal History and Characteristics

### A. Mr. Fu's Early Life in Communist China

Mr. Fu grew up in Shandong Province, China, within a highly competitive environment where both of his parents worked for the same company. From his earliest years, he struggled to find his footing in China's rigid state education system. At home, the environment was similarly stressful; his father drank heavily and struggled with anger. Thus, leading to frequent domestic volatility and physical altercations that ultimately required intervention from neighbors.

Reflecting on his childhood, his mother recalls that Mr. Fu always appeared "a little off" compared to his peers; he was quiet and kept to himself. He did not display the same outward drive or focus as other children his age. He did not have many friends. Consequently, he was frequently bullied by his classmates.

In present day, most children who exhibit such isolative behavior would have been tested for ASD. However, in 1990's China, it would have been unheard of. Not only because ASD was a relatively "new" diagnosis, but because China's view on any sort of mental health condition was stigmatized.

### B. Higher Education and Professional Career

In the face of developmental, social, and environmental obstacles, Mr. Fu completed his undergraduate education but systemic limitations in China ultimately prevented him from advancing his studies. Seeking to continue his education and build a secure, independent life, Mr. Fu immigrated to the United States after being accepted into the Stevens Institute of Technology. There, Mr. Fu successfully completed his advanced coursework, earning his Bachelor of Science in 2009, and his Master of Computer Science in 2014.

Following graduation, Mr. Fu established a consistent and productive professional career. He initially worked as a Java Developer at Avesta Computer Services for two and a half years. Seeking further professional advancement, he secured a position in 2017 as a Software Engineer at Cox Automotive. Mr. Fu remained gainfully and continuously employed in this role for approximately seven years, until his arrest in March 2024.

From his university years through his entry into the workforce, Mr. Fu consistently failed to form meaningful connections—even when surrounded by like-minded peers who shared his exact interests.

### C. Violent Assault and Medical Hardships

On an evening in September 2012, while returning home from campus, Mr. Fu was the victim of a violent assault and robbery perpetrated by three teenagers. This traumatic event resulted in severe physical trauma, including multiple contusions to his head, limb and torso, as well as permanent ocular damage. Specifically, the physical violence inflicted during the attack caused a detached retina in Mr. Fu's right eye.

Since the assault, Mr. Fu has undergone multiple intricate retinal surgeries on both eyes. After more than five years of continuous medical treatment and recovery protocols, he has permanent, irreversible vision damage and optical distortion in his right eye. As a result of these injuries, physicians have advised Mr. Fu against air travel; therefore, he was unable to see his family in China since the assault until recently when they came to the United States.

### D. Recently Diagnosed Untreated Mental Health Conditions

Mr. Fu has recently been diagnosed with both PTSD, which is directly related to the 2012 assault, as well as ASD. In 2025, Mr. Fu was evaluated by Alexander Westphal, M.D., Ph.D., a psychiatrist and professor at Yale Medical School.[1] After performing a battery of tests, Dr. Westphal diagnosed Mr. Fu with ASD[2] (Attach., p. 010) and, because of the 2012 assault, PTSD (Attach., p. 017). Dr. Westphal found that Mr. Fu's

---

[1] Dr. Westphal is certified by the American Board of Psychiatry and Neurology whose clinical research focuses on autism. His curriculum vitae is available upon request.
[2] Dr. Westphal's Psychological Report dated February 21, 2026 (Attach., p. 001).

"overall adaptive functioning" is akin to that of an "eight to 10-year-old" child. (Attach., p. 013).[3] Importantly, Dr. Westphal also found a "direct and substantial connection between Mr. Fu's ASD and the conduct that led to the present charges." (Attach., p. 025). According to Dr. Westphal, this link is critically important because Mr. Fu's autism "meaningfully diminished the degree to which Mr. Fu's behavior reflected the kind of informed, freely chosen moral decision-making that typically underlies full adult culpability." (Attach., p. 026).

### 1. Post-Traumatic Stress Disorder

Dr. Westphal diagnosed Mr. Fu with PTSD relating to the 2021 robbery and assault. (Attach., p. 016). During the robbery, Mr. Fu was attacked by three teenagers, and sustained lacerations to his face, elbow, and knee. He was also kicked in his right eye, causing retinal detachment and the loss of vision in that eye. (Attach., p. 005).[4] Following the attack, Mr. Fu experienced persistent nightmares, he was "scared all the time," and he was prescribed Prazosin (a medication used to reduce trauma related night terrors). (Attach., p. 016). Mr. Fu also exhibits hypervigilance (never feeling safe and maintaining a heightened alertness) and being easily startled by environmental stimuli. (Attach., p. 017). These issues still plague Mr. Fu today.

Dr. Westphal found that Mr. Fu's ASD "was significantly compounded by trauma and isolation." (Attach., p. 025). And he found that the debilitating symptoms from the attack "significantly impacted his daily life, causing depression, anxiety, sleep, and concentration difficulties, and heightened irritability, further isolating him and leading

[3] Adaptive functioning is defined as the "practical, social, and communication skills in day-to-day life." (Attach., p. 013).
[4] Today, Mr. Fu's vision in his right eye is blurry beyond two feet.

to paranoia about his safety." (Attach., p. 025).

### 2. Autism Spectrum Disorder

Autism Spectrum Disorder "is a neurological and developmental disorder that affects how people interact with others, communicate, learn, and behave."[5] People with autism often have: 1) difficulty with social communication and interaction with others; 2) restricted interests and repetitive behaviors and; 3) symptoms that affect their ability to function normally in school, work, relationships, and other areas of life.[6]

#### (a) ASD Origins[7]

To understand why Mr. Fu was left undiagnosed until his late 30s; OR, what implications such a diagnosis would have had on his childhood in communist China, you must envision a time when the condition was virtually invisible to the public.

The word "autism" was first coined in 1911 by Eugen Bleuler, a Swiss psychiatrist. He used the word to describe a specific symptom of schizophrenia where a patient withdrew severely into their own inner world. The origin of the word, *autism*, is Greek, *autos*, meaning "self."

In the 1920s, Grunya Sukhareva, a Soviet pediatric psychiatrist, was the first mental health professional to lay-out the condition of autism. Dr. Sukhareva published highly detailed case studies of children exhibiting traits like social withdrawal, intense specific interests, etc. Her descriptions parallel the modern diagnostic criteria.

---

[5] https://www.nimh.nih.gov/health/publications/autism-spectrum-disorder
[6] Id.
[7] https://theautismservice.co.uk/the-history-of-autism/

In the 1940s, two independent researchers – Leo Kanner, an Austrian American psychiatrist in Baltimore, and Hans Asperger, an Austrian physician in Vienna – put autism on the global medical map with groundbreaking publications.

Dr Kanner published, *Autistic Disturbances of Affective Contact*, illustrating several children who presented "a powerful desire for aloneness" and "an obsessive insistence on persistent sameness." Dr. Kanner called the condition, "early infantile autism."

Dr. Asperger published a definition of "autistic psychopathy" that mirrored the earlier definition Dr. Sukhareva published in the 1920s. Dr. Asperger studied four boys with certain patterns of behavior, such as lack of empathy, inability to form friendships, intense absorption in a special interest, etc. Dr. Asperger noted that some of the children he identified as autistic used their special skills in adulthood and went on to have successful careers.

Unfortunately, even after the publications of Drs. Sukhareva, Kanner and Asperger, the medical community wasted decades misclassifying autism. Throughout the 1950s and 1960s, it was still officially treated as "childhood schizophrenia" in the *Diagnostic and Statistical Manual of Mental Disorders (DSM)*. It would not be until 1980 with the publication of the *DSM-III* – just six years before Mr. Fu was born – that "childhood autism" was finally listed as its own distinct, standalone developmental disorder.

### (b) ASD in 1990s China

The term used in mainland China — *gudu zheng* (孤独症) — literally translates to "the loneliness disease," which was first introduced to the country's medical community in 1982 by Guotai Tao, a pediatric psychiatrist. By the 1990s, awareness was still in its

absolute infancy. Because autism was not yet integrated into the Chinese national healthcare system or standard medical training, Mr. Fu would have likely been misdiagnosed with childhood schizophrenia, intellectual disability, or severe developmental delay. For a young boy growing up in that decade, his reality would have been defined by extreme medical isolation, intense cultural pressure, and a total lack of institutional support.

Chinese society in the 1990s was heavily rooted in Confucian traditions that deeply valued conformity, achievement and social cohesion. A child who did not conform, could not maintain eye contact or exhibited public outbursts, was often seen as bringing a loss of face or honor to the family.

The concept of neurodiversity simply did not exist. Instead, neighbors, teachers, and even extended family might assume the boy was simply "spoiled" due to China's Single-Child Policy, or that his parents had failed to discipline him. Because of the heavy social stigma and fear of being ostracized, families often hide their children away at home.

If a boy was diagnosed in the 1990s, his formal schooling options were essentially zero. "Mainstream schools" or "public schools" had massive class sizes and no resources for special needs. A child who could not sit quietly or communicate traditionally was almost universally rejected or expelled. While China had special schools for deaf or blind students, they were entirely unequipped for cognitive or neurological differences like autism. Because of this systemic gap, the boy's parents — most often, the mother — had to completely give up their careers to become his full-time, around-the-clock educators.

It was not until 2006 — long after Mr. Fu's adolescence —that the Chinese government officially recognized autism as a distinct neurological disability.

### (c) ASD as it relates to Wei Fu

*Mr. Fu's Adaptive Functioning is the same as a Child*

As indicated above, after instituting a series of tests, Dr. Westphal diagnosed Mr. Fu with ASD. One of the tests was the Vineland-3 Adaptive Behavior Assessment to examine Mr. Fu's adaptive functioning across daily life skills. Dr. Westphal found that Mr. Fu's "general adaptive functioning is *lower than 99% of individuals in his age group*, representing a profound deficit in everyday life skills." (Ex. 1, @ p. 12) [Emphasis added].

Dr. Westphal noted that Mr. Fu "demonstrates pervasive difficulties across all aspects of social functioning" and that, "[h]is interpersonal relationships are severely compromised, with minimal ability to engage in reciprocal social interactions, maintain friendships, or demonstrate appropriate social responsiveness." (Attach., p. 012). Dr. Westphal concluded: "although Mr. Fu is a chronologically 38-year-old man with high intellectual ability, his overall adaptive functioning – that is, *his practical, social, and communication skills in day-to-day life – is broadly comparable to that of a late-elementary-school child, in the 8–10-year-old range*." (Attach., p. 013) [Emphasis added].

*Mr. Fu's Autistic Traits*

Dr. Westphal found that Mr. Fu's "social learning deficits meant he may not have known basic social conventions and mores that others take for granted" and that Mr. Fu's "impaired Theory of Mind may have led him to struggle understanding what others were thinking or feeling, potentially contributing to difficulty understanding the harm

involved in creating CSAM." (Attach., p. 025).[8]

He found that Mr. Fu "exhibited restricted and repetitive behaviors including compulsive handwashing, intense focus on specific topics through deep dives, inflexible thinking patterns, rigid perfectionism, resistance to routine changes, and poor problem-solving skills." And he opined that Mr. Fu's "rigid thinking about his special interest topic, combined with limited social experience and poor social foresight skills, *caused him to proceed without fully grasping the dangers or foreseeing that encountering such material could lead to a federal investigation*." (Attach., p. 025) [Emphasis added]. Dr. Westphal also noted that Mr. Fu displayed an "obsessive collecting pattern" and that "his collecting behavior appeared driven by obsessive-compulsive tendencies rather than sexual deviance." (Attach., p. 028).

*Mr. Fu's Autism is Directly Linked to the Charged Conduct*

Dr. Westphal found that, "there is a direct and substantial connection between Mr. Fu's Autism Spectrum Disorder and the conduct that led to the present charges." (Attach., p. 025). He explained:

> [Mr. Fu's] autistic traits, including profound social-communication deficits, childlike social maturity despite intact intellect, intense and narrow special interests, and rigid, detail-focused thinking, *significantly impaired his ability to understand the social and legal meaning of the material he was downloading* and collecting. Instead of approaching online sexual material with the perspective and judgment of a typical adult, he approached it in a highly literal, rule-based way, focusing on acquiring and organizing large quantities of files as part of an obsessive collecting pattern, *without adequately appreciating the human harm reflected in those images*.
>
> The same neurodevelopmental vulnerabilities that have affected him for his entire life, difficulty recognizing others' perspectives and emotions, limited understanding of unwritten social rules, problems foreseeing the consequences of his behavior, and a longstanding tendency to retreat into

[8] Theory of Mind is the ability to "understand[] others' perspectives and emotional states." (Ex. 1 @ 26).

> solitary, technology-based interests, *all converged in the online environment and made him unusually susceptible to engaging in this offending behavior via digital collecting*, rather than through an antisocial or predatory sexual motivation.

(Attach., p. 025) [Emphasis added].

*Fu's Culpability is Significantly Reduced*

Dr. Westphal also explained why moral culpability is often significantly reduced for individuals with autism. He explained that "marked delays in . . . social maturity" causes a failure to internalize "unwritten social and moral rules that most neuro-typical adults absorb incidentally." He also further explained why people with autism have impairment of Theory of Mind: "concrete and literal thinking, and a tendency to focus on details rather than the broader social meaning of a situation can all interfere with appreciating the full human impact of one's behavior, particularly in abstract, technology-mediated contexts such as the internet." (Attach., p. 026).

Dr. Westphal also explained that many autistic individuals rely heavily on rules and external structure rather than intuitive moral reasoning:

> When rules are complex, inconsistently enforced, or poorly explained, they may follow idiosyncratic internal rules (for example, distinguishing between 'looking' and 'hurting' or between 'collecting' and 'actively participating') that diverge from the law's and society's understanding of the same conduct. These neurodevelopmental limitations do not excuse criminal behavior but do mean that, in general, *autistic defendants often have a diminished capacity to appreciate risk, foresee consequences, and grasp the depth of wrongfulness* in the same way as a typical adult.

(Attach., p. 026) [Emphasis added].

Importantly, Dr. Westphal found Mr. Fu's autism assessment showed this very pattern of reduced culpability:

> [Mr. Fu] has very low adaptive socialization scores, with social functioning and judgment more consistent with a child or young adolescent despite high measured intellect, and lifelong difficulty understanding social cues,

> age-related norms, and the emotional experiences of others. His history and testing demonstrate pronounced cognitive rigidity, intense collecting behavior, and immersion in solitary, computer-based interests, all of which made him *especially vulnerable to engaging with online material without fully grasping its legal and moral implications*. Taken together, these autism-related deficits in social understanding, emotional perspective-taking, and social maturity *meaningfully diminished the degree to which Mr. Fu's behavior reflected the kind of informed, freely chosen moral decision-making that typically underlies full adult culpability*, even though he accepts responsibility and meets the legal criteria for guilt.

(Attach., p. 026) [Emphasis added].[9]

### E. Residual Effects of Untreated Mental Health Disorders

#### 1. Profound Isolation and Impaired Coping Mechanisms

The compounding effects of severe physical trauma, chronic ocular pain, and unaddressed psychiatric conditions led Mr. Fu into a state of profound social isolation. This deep isolation significantly impaired his capacity for emotional regulation, stripped him of a meaningful support network, and severely diminished his ability to cope with daily stressors. Left entirely untreated, Mr. Fu's psychological distress, trauma, and isolation eventually manifested as a severe compulsive hoarding disorder.

#### 2. Development of Compulsive Hoarding

To understand Mr. Fu's activity in this case, one must look at it through the lens of Mr. Fu's recent ASD diagnosis. A well-documented trait of individuals with ASD is the compulsive, highly focused collection of "things"—an obsession with the act of acquiring rather than using.

---

[9] "Much of the deviant or sexual offending behavior exhibited among those with ASD is often a manifestation of their ASD symptoms, and not malice." M.C. Mogavero, *Autism, Sexual Offending, and the Criminal Justice System*, J. INTELLECTUAL DISABILITIES & OFFENDING BEHAV. 116-126 (2016).

Mr. Fu's home was essentially a monument to this neurodivergent trait. He purchased exercise equipment and a large volume of hardware (30+ power tools and 100+ hand tools). He also legally purchased 297 firearms, which included a substantial quantity of related inventory: 100+ various types of gun parts; 250+ magazine units; 5,100+ rounds of ammunition. The firearms sat untouched in their original shipping boxes, and the exercise gear remained entirely unassembled.

This identical behavioral pattern extended to his digital devices. The electronic evidence shows that most of the illicit material was found in unopened files. Beside illicit materials, there were also 10+ TB of video gaming platforms; 11+ TB of anime, movies and television shows; and, 24+ TB of adult media. This strongly indicates that his behavior was driven by a clinical, compulsive urge to collect and catalog data, rather than an active desire to view or consume the content. Child pornography comprised less than 1% of the overall digital storage volume.

## II. Sentencing Factors Under §3553(A)

The Presentence Investigation Report ("PSR") determined Mr. Fu's total offense level is 30. Having no criminal history, he falls within Criminal History Category 1. Based on a total offense level of 30 and a Criminal History Category of 1, Mr. Fu's guidelines range is **97 to 121 months**.

As the Court is aware, the sentencing guidelines are advisory, and the Court must ultimately impose a sentence that is "sufficient, but not greater than necessary" after considering the sentencing factors under 18 U.S.C. §3553(a). Among the factors under §3553(a), the Court is required to consider: 1) the nature and circumstances of the offense; 2) the history and characteristics of the defendant; 3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; and 4) the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Attached is Mr. Fu's statement in his own words (Attach., p. 035). He knows he committed a serious offense in possessing child sex abuse material ("CSAM"). He fully acknowledges the gravity of possessing such material and expresses deep devastation over the harm caused to victims. Following the traumatic 2012 assault, untreated ASD, PTSD and isolation led Mr. Fu into a severe compulsive hoarding disorder culminating in his 2024 arrest. He has lost his career and caused his family shame. Over the past 28 months, he has actively pursued rehabilitation and re-engaged with his Buddhist faith.

### A. Nature and Circumstances of the Offense

As reflected by the U.S. Sentencing Commission's 2021 study of non-production CSAM cases, however, the sentencing guidelines as applied under §2G2.2 do not accurately reflect the circumstances of this type of offense, or this kind of offender. As a result, the sentencing guidelines do not serve as a reliable starting point for sentences in these cases.

The U.S. Sentencing Commission released a report titled *Federal Sentencing of Child Pornography: Non-Production Offenses*, studying how district courts apply §2G2.2 and the kinds of sentences that are most often imposed in non-production cases.[10] The Commission found that, due to significant advances in technology, §2G2.2 fails to meaningfully distinguish between more and less culpable offenders.[11] For example, the Commission notes that four of the six enhancements under §2G2.2, each of

[10] *See*, United States Sentencing Commission. *Federal Sentencing of Child Pornography: Non-Production Offenses* (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf (hereinafter, "Commission Report").
[11] Id. at 19.

which has been applied here for a combined 13 offense level points, "cover conduct that has become so ubiquitous that they now apply in the vast majority of cases sentenced under §2G2.2."[12]

The Commission recommended that sentencing courts assess a defendant's culpability based on aggravating factors, including the degree of involvement with other offenders (*i.e.*, being a member of an internet community devoted to CSAM) as well as "aggravating conduct," which is defined as the offender's engagement in sexually abusive or exploitative conduct (both contact and non-contact conduct) in addition to the CSAM offense.[13]

Regarding a defendant's participation in an "online child pornography community," the Commission treats this as an aggravating factor because such communities normalize CSAM, incentivize offenders to engage in production, and facilitate a commercial market for child pornography.[14] The Commission found that more than 43% of all offenders sentenced under §2G2.2 participated in an online child pornography community in fiscal year 2018, that the "more serious types" of offenders were "more likely to participate in a community," and that offenders convicted of simple possession offenses participated in communities in 36.4% of cases.[15]

With regard to "aggravating sexual conduct," the Commission found that 43.7% of offenders sentenced under §2G2.2 engaged in such aggravating sexual conduct, and,

[12] Id. at 68, 4. "For example, in fiscal year 2019, over 95 percent of non-production child pornography offenders received enhancements for use of a computer and for the age of the victim (images depicting victims under the age of 12). The enhancements for images depicting sadistic or masochistic conduct or abuse of an infant or toddler (84.0% of cases) or having 600 or more images (77.2% of cases) were also applied in most cases."
[13] Id. at 2, 28
[14] Id. at 36-37
[15] Id. at 6, 38

as with the community factor, the Commission found that the "the most serious type of non-production offender under §2G2.2 had the highest prevalence of aggravating conduct at 51.2%," though as many as 43.9% of defendants in simple possession cases also had a record of aggravating conduct.[16]

There is no evidence that Mr. Fu was the member on an online community or that he ever engaged in aggravating sexual conduct. The Commission found that defendants like Mr. Fu (who do not participate in online CSAM communities or engage in aggravating sexual conduct) received downward variances in most cases.[17]

It is true that this case involves thousands of images, but this is not unusual. The Commission found that "the volume and accessibility of child pornography images had increased dramatically due to the rising use of computers, digital cameras, and internet-based technology like peer-to-peer ("P2P") file sharing programs," and that, as a result, "the typical offender's collection in fiscal year 2019 was voluminous and contained a wide variety of graphic sexual images, including images of very young victims."[18]

Applying these factors in this case, the total offense level calculated under §2G2.2 significantly overstates Mr. Fu's culpability.

---

[16] Id. at 41.
[17] Id. at 45. "Over seventy-five percent of offenders who did not participate in a child pornography community or engage in aggravating conduct received downward variances, while only 15.6 percent of them received a within-guideline range sentence."
[18] Commission Report, supra, note 3, at 1, 30. *See also Id*. at 4 ("In fiscal year 2019, non-production child pornography offenses involved a median number of 4,265 images, with some offenders possessing and distributing millions of images and videos."); Id. at 31 ("A majority of the non-production child pornography offenders had images or videos of very young victims. In fiscal year 2019, over half (52.2%) of the offenders had images or videos of infants or toddlers (22.8% and 29.4%, respectively) and nearly every offender (99.4%) had images or videos depicting victims who were prepubescent or under the age of 13. In other words, less than one percent of non-production offenders had images or videos consisting solely of victims age 13 years or older.").

### B. Sentencings in CSAM Cases

A significant downward variance from the Advisory Guidelines in this case is also necessary to avoid unwarranted sentencing disparities. Many district courts have concluded that U.S.S.G. §2G2.2 is a flawed guideline for determining a reasonable sentence in non-production CSAM cases. As a result, most of the courts reject §2G2.2 and routinely sentence non-production CSAM offenders well below the guidelines.

The Commission's report shows that less than 30% of non-production offenders received a sentence within the sentencing guidelines in 2019, and a substantial majority (59%) received a downward variance.[19] The Judiciary Sentencing Information (JSIN), which is published by the United States Sentencing Commission, shows that over the last five years, offenders with Mr. Fu's criminal history category and total offense level under §2G2.2 received a downward variance or departure 72% of the time, and the average sentence for such offenders was 73 months.[20] Notably, this data set groups those convicted of distribution, receipt, and simple possession. The average sentence of offenders convicted only possession is likely even lower.

It should also be noted that Mr. Fu's guideline range of 97 to 121 months is significantly lower than the average guidelines range in non-production cases. Indeed, the average "guidelines minimum for non-production child pornography offenders increased from 98 months in fiscal year 2005 to 136 months in fiscal year 2019."[21]

In one case study, the Commission looked at 82 possession offenders who received a distribution enhancement with a guideline range of 97 to 121 months. The

---

[19] Commission Report, *supra* note 3, at 5.
[20] Judiciary Sentencing Information (JSIN). United States Sentencing Commission. Accessed January 13, 2023. https://jsin.ussc.gov/analytics/saw.dll?Dashboard
[21] Commission Report, *supra* note 3, at 5.

Commission found that sentences ranged from time served to 121 months.[22] For these offenders, the average sentence was 57 months, and nearly 82% of those offenders were sentenced below the guideline range.[23]

Thus, the typical defendant is already given a significantly lower sentence than what the sentencing guidelines suggest. Mr. Fu, however, is anything but a typical defendant. Dr. Westphal, a psychiatrist from Yale, found that Mr. Fu's functional abilities are the equivalent of an eight-to 10-year-old child. Dr. Westphal also drew a direct line from Mr. Fu's autism to the offense conduct, and he explained why Mr. Fu is much less culpable that a neuro-typical individual. Dr. Westphal also called on the need for "diversion programs" for people like Mr. Fu. That, of course, is not possible, but a sentence which avoids the dangers of prison is possible.

### C. Prior Sentences by the Court

The Court has gone below the sentencing guidelines in several CSAM cases to avoid unduly harsh sentences. United States v. Oliver, 3:23-cr-00117 (M.D. Pa. 1/22/2025) (downward variance from 210 to 262 months to 60 months for distribution); United States v. Lazar, 3:22-CR-00021 (M.D. Pa. 2/19/2023) (downward variance from 151-188 months to 60 months for receipt and distribution); United States v. Watkins, 3:21-CR-00041 (M.D. Pa. 2/9/2022) (downward variance to 60 months

[22] The statistics set forth above show that district courts do sentence defendants to probationary sentences in possession cases and that such variances can be proper. Accord, e.g. United States v. Duhon, 541 F.3d 391 (5th Cir. 2008) (affirming a sentence of 60 months of probation); United States v. Rowan, 530 F.3d 379 (5th Cir. 2008) (affirming a sentence of 60 months of probation); United States v. Nash, 1 F.Supp.3d 1240 (N.D. Al. 2014) (sentencing a defendant to 60 months of probation). Compare, United States v. Pugh, 515 F.3d 1179 (11th Cir. 2008), vacating a 60-month probation sentence where the defendant had traded images in chat rooms and his Guidelines called for 97 to 120 months' imprisonment: "His resulting probationary sentence . . . without any home confinement or long-term supervised release – afforded precious little weight to the principles underlying . . . 3553(a)(2)(A)."

[23] Commission Report, at 57.

imprisonment for receipt and distribution); United States v. Hart, 3:20-CR-191) (downward variance to 60 months for receipt and distribution); United States v. Killmeyer, 3:20-CR-00044 (M.D. Pa. 2/23/2021) (downward variance for receipt and distribution); United States v. William Barrattt, 3:19-CR-0178 (M.D. Pa. 8/27/2020) (downward variance from 135 to 168 to 60 months).

### D. United States v. Goff and United States v. Lychock

The Government may point to United States v. Goff, 501 F.3d 250 (3rd Cir. 2007), and United States v. Lychock, 578 F.3d 214 (3rd Cir. 2009), to argue that a home confinement sentence is unreasonable. In Goff, a possession of CSAM case, the district court varied downward from 33 to 41 months to a four-month prison sentence. Id., at 262. In support of the variance, the defendant argued that he had led a law-abiding life, had strong support in the community, and that prosecution had significantly impacted his life. The Third Circuit nonetheless vacated, finding that the sentence was "unreasonable in light of the facts and circumstances revealed in the record." Id.

In Lychock, a possession of CSAM case, the district court varied downward from 30 to 37 months to five years of probation. The Third Circuit again vacated the sentence, finding that the district court ignored relevant factors and failed to "offer a reasonable explanation for its departure." Id., at 220. The Court reasoned that Lychock's age of 37, lack of criminal history, acceptance of responsibility, and decision to seek psychological treatment could not justify the significant downward variance. Id.

First, Goff and Lychock did not foreclose the possibility of a significant period of home incarceration in possession of CSAM cases. Second, Mr. Fu is categorically different from the defendants in Goff and Lychock. While the defendants in Goff and Lychock were normal adult men, Mr. Fu is essentially an eight-to-10-year-old child. And

unlike in Goff and Lychock, Mr. Fu suffers from a neurological condition (not of his own making) which *likely caused* the offense conduct and *significantly diminished* his moral culpability.[24] Furthermore, Mr. Fu's autism and PTSD will make a prison sentence a much more dangerous and traumatizing experience than it would for the defendants in Goff and Lychock.

### E. United States v. Grober

#### 1. Many Courts have concluded that sentencing ranges produced by U.S.S.G. §2G2.2 are unreasonably high.

Because of case-specific considerations, policy reasons, or both, sentencing courts may vary from the Guidelines. Spears v. United States, 129 S.Ct. 840, 843 (2009). District Courts are free to disagree with guidelines or policy grounds where those guidelines were created pursuant to Congressional directive unopposed by original data. United States v. Grober, 624 F.3d 592 (3rd Cir. 2010). The Third Circuit has recognized that a "Guideline is likely to reflect a rough approximation of sentences that might achieve §3553(a)'s objectives *only when it is the product of empirical data and national experience, guided by a professional staff with appropriated expertise*." Id. citing United States v. Arrelucca-Zamudio, 581 F2d 142 (3rd Cir. 2009) [emphasis added].

The Third Circuit in Grober, and the Second Circuit in United States v. Dorvee, 616 F.3d 174 (2nd Cir. 2010), as well as numerous district courts across the country, have found that U.S.S.G. §2G2.2 was not developed pursuant to the Commission's

[24] In an unpublished opinion, the Third Circuit vacated a 30-day sentence in a CSAM case where the sentencing guidelines called for 63 to 78 months, despite some evidence of the defendant having a learning disability. See, United States v. Ramey, 721 Fed. App. 135 (3rd Cir. 2018). Unlike in the instant case, there was no specific diagnosis, there was no link between the disability and the offense, there was no evidence of diminished culpability, and there was no discussion of how the disability might impact the defendant in prison.

institutional role. Rather, §2G2.2 was developed largely pursuant to Congressional directives. Grober, 624 F.3d at 600. Thus, there can be no expectation that a guideline range calculated under U.S.S.G. 2G2.2 reflects the purposes of sentencing and the other factors set forth in 18 U.S.C. §3553(a)(2): deterrence, just punishment, incapacitation and rehabilitation. Id.

In addition to the Third Circuit in Grober and the Second Circuit in Dorvee[25], numerous sentencing courts across the country have concluded that §2G2.2 is flawed and should not be afforded deference. Grober, 624 F.3d at 596 (citing United States v. Diaz, 720 F.Supp.2d 1039, 2010 WL 2640630 (E.D. Wis. 2010) collecting cases[26]); United States v. Riley, 655 F.Supp.2d 1298 (S.D. Fla. 2009); United states v. McElheney, 630 F.Supp.2d 886 (E.D. Tenn. 2009); United States v. Beiermann, 599 F.Supp.2d 1087 (N.D. Iowa 2009); United States v. Phinney, 599 F.Supp.2d 1037 (E.D. Wis. 2009)).

Additionally, according to the Sentencing Commission, in fiscal year 2009, 43.03% of §2G2.2 sentences were non-government-sponsored, below-Guideline

---

[25] Other Courts of Appeals have also affirmed district courts who have given significant downward variances in §2G2.2 cases. United States v. Rowan, 530 F.3rd 379 (5th Cir. 2008) (affirming sentence of 60 months of supervised release for Possession of Child Pornography despite the fact the guidelines called for 46 to 57 months incarceration); United States v. Huckins, 529 F.3d (10th Cir. 2008) (affirming a sentence of 18 months incarceration for Possession of Child Pornography despite the fact the guidelines called for 78 to 97 months incarceration); United States v. Duhon, 2008 WL 3843073 (5th Cir. 2008) (affirming a sentence of 60 months' probation despite the fact the guidelines called for 27 to 33 months incarceration); United States v. Grossman, 513 F.3d 592 (6th Cir. 2008) (affirming a sentence of 66 months incarceration despite the fact the guidelines called for 165 to 168 months incarceration).

[26] Cases collected by the District Court in United States v. Diaz, also include: United States v. Tews, Case #2:2009-cr-00309, 2010 WL 1608951; United States v. Howard, Case #8:2008-cr-00387, 2010 WL 749782 (D. Neb., March 1, 2010); United States v. Manke, Case #2:2009-cr-00172, 2010 WL 307937 (E.D. Wis., Jan. 19, 2010); United States v. Ruby, Case #2:2005-cr-00003, 2009 WL 5173964 (S.D. W. Va., Dec. 30, 2009); United States v. Burns, Case #1:2007-cr-00556, 2009 WL 3617448 (N.D. Ill., Oct. 27, 2009); United States v. Stern, 590 F.Supp.2d 945 (N.D. Ohio 2008); United States v. Doktor, Case #6:2008-cr-00046, 2008 WL 5334121 (M.D. Fla., Dec. 19, 2008); United States v. Johnson, 588 F.Supp.2d 997 (S.D. Iowa 2008); United States v. Noxon, Case #5:2007-cr-40152, 2008 WL 4758583 (D. Kan., Oct. 28, 2008); United States v. Ontiveros, Case #1:2007-cr-00333, 2008 WL 2937539 (E.D. Wis., July 24, 2008); United States v. Hanson, 561 F.Supp.2d 1004 (E.D. Wis., 2008); United States v. Shipley, 560 F.Supp.2d 739 (S.D. Iowa 2008); and, United States v. Baird, 580 F.Supp.2d 889 (D. NEB. 2008). 2010 WL 2640630 at *3.

sentences, compared to 15.9% for all offenders. U.S. Sentencing Comm'n, *2009 Sourcebook of Federal Sentencing Statistics*, Tables 28 & N[27]. Through the second quarter of fiscal year 2010, for the six months beginning October 1, 2009, an all-time high of 52.3% of §2G2.2 cases (451/862) were sentenced below the guideline range for reasons other than government-sponsored U.S.S.G. §5K1 motions. U.S. Sentencing Comm'n, *Preliminary Quarter Data Report: 2nd Quarter Release* (June 1, 2010) at 14 (Table 5)[28].

In a survey of U.S. District Court judges conducted by the Sentencing Commission, 570 judges responded to the question, "Is the guideline range generally appropriate for each following type of offense?" 69% of the 570 responding judges stated that the guideline range for receipt of child pornography was "too high," and 70% said the range for possession of child pornography was "too high."[29] Even when asked about the five-year mandatory minimum sentence for receipt of child pornography, 71% of the 585 responding judges said that the prescribed mandatory minimum sentence was "too high." Id. Thus, the national trend amount judges seem to reject the reasonableness and fairness of sentences with the guideline range produced by §2G2.2.

**2. U.S.S.G. §2G2.2 was not developed pursuant to the Sentencing Commission's characteristic institutional role.**

The Third Circuit held in Grober that §2G2.2 was not developed pursuant to the Sentencing Commission's characteristic institutional role. United States v. Grober, 624 F.3d 592. In its typical role, the Commission promulgates guidelines after careful study based on extensive empirical evidence derived from the review of thousands of

[27] Available at: http://www.ussc.gove//ANNRPT/2009/SBTOC09.htm.
[28] Available at: http://www.ussc.gov/sc_cases/ussc_2010_Quarter_Report_2nd.pdf.
[29] Available at: http://www.ussc.gov/Judge_Survey/2010JudgeSurvey_201006.pdf.

individual sentencing decisions. It also engages in empirically based recidivism studies. The goal of these studies is to develop guidelines that meet the goals of sentencing embodied in 18 U.S.C. §3553(a)(2): deterrence; just punishment; incapacitation; and rehabilitation. §2G2.2 was not written in this fashion. Rather, it was developed largely pursuant to Congressional directives and political whim. "[T]he Commission was constantly reacting to Congress's repeated directives, and the penalties for child pornography offenses were steadily, and often dramatically, increasing. The result is a Guideline provision where, as the Commission found, if the base offense level was any higher, the typical offender sentenced for receipt of child pornography would face a higher Guideline range than the typical offender convicted of conspiracy to commit murder and kidnapping." Grober, 624 F.3d at 596.

For example, in 1991, members of Congress, who wanted higher penalties for "smut peddlers" and "pedophiles," specifically directed the Commission to make a variety of changes to the child pornography guidelines resulting in higher base offense levels. This change was made even though the Commission objected that the Guidelines would require substantially tougher penalties than typically imposed under pre-guideline practice, and that their data suggested judges and prosecutors thought the offense level for the least serious form of conduct under §2G2.2 was too severe. Grober, 624 F.3d at 596.

In 1995, Congress again directed the Commission to increase the base offense level and added a computer enhancement. Grober, 624 F.3d at 597. Once again, the Commission expressed concerns that the computer enhancement would apply too broadly and fail to distinguish between offenders who used a computer to widely disseminate child pornography and those who emailed images to a single voluntary

recipient. Id. In 2003, Congress directly amended the child pornography guidelines, bypassing the Sentencing Commission altogether. Id. The former United States Attorney for the Eastern District of New York described this act as the "most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress." Id. The Commission noted that these new amendments would more than double the average sentences under §2G2.2. Id.

This history shows that rather than being based on empirical data and research, §2G2.2 is based on Congressional directives and political whim. It was never developed with an eye toward the purposes of sentencing and fails to account for factors listed in 18 U.S.C. §3553(a)(2). Because §2G2.2 is not based on the institutional expertise of the Sentencing Commission and does not consider empirical data, a district court may accord the guidelines less deference. Kimbrough v. United States, 128 S.Ct. 558, 575 (2007).

## III. Other Factors

### A. Impact of Plea Agreement

Mr. Fu entered into this plea agreement with a full understanding of the collateral consequences. He knows that the charges to which he has pled guilty constitute removable offenses under federal law. By accepting responsibility, Mr. Fu has effectively signed a document that may serve as his own ticket of removal from the country he has called home for many years. He is not merely facing a term of incarceration; he is facing the permanent dissolution of the life he has built in the United States. And, because offenses involving children are treated with zero tolerance in China, a citizen repatriated for such a significant crime could face dual sovereignty issues under domestic Chinese law upon arrival.

### B. Vulnerability in Prison

In his report, Dr. Westphal details why prison is a more dangerous place for individuals with ASD. He explains that people with autism struggle to interpret subtle social cues, nonverbal communication, and the nuances of social interaction. These challenges make autistic inmates more susceptible to "manipulation, exploitation, and bullying by other inmates." (Attach., p. 027).[30] Autistic inmates are also more likely to be placed in isolation which exacerbates social isolation, limits access to programs and potentially leads to longer periods of incarceration.

Mr. Fu will also face dangers from prison staff. Dr. Westphal explains:

> The unique behaviors associated with ASD, such as limited eye contact, repetitive movements, or difficulty expressing emotions, could be misconstrued by prison staff as noncompliance, disrespect, or even guilt. This could lead to unfair, disproportionate and unmerited disciplinary action or negative perceptions that hindered their progress within the system.

(Attach., p. 027).

Autistic individuals also have a strong need for routine and predictability. The prison system, however, is often unpredictable and chaotic making it "extremely stressful and difficult to adapt to." (Attach., p. 027). As with Mr. Fu, autistic individuals often possess "heightened sensory sensitivities to noise, light, touch, or other stimuli" and "[t]he overstimulating environment of a prison, with its constant noise, crowds, and lack of personal space, could be overwhelming and could lead to sensory overload or meltdowns." (Attach., p. 028). Dr. Westphal also cautions that, "[p]risons are rarely

[30] In the United Kingdom, the National Autistic Society publishes a guide called, *Autism: A Guide for Criminal Justice Professionals*, which notes: "People with autism who are being held in custody must be supported. It is best practice to . . . remember their disability renders them vulnerable." See, https://zakon.co.uk/admin/resources/downloads/autism-a-guide-for-criminaljustice-professionals-2011.pdf

equipped to understand and support autistic people" and that, "[r]ehabilitation programs within prisons are often not designed to accommodate the unique learning styles and communication needs of autistic individuals." (Attach., p. 027).

Due to his autism, a prison sentence for Mr. Fu will be far more fraught with danger than the typical defendant.[31] His PTSD will also ensure significant and unnecessary daily suffering.

### C. Disproportionate Severity of Incarceration and Ineligibility for Relief

Due to his immigration status, the Bureau of Prisons ("BOP") will not allow Mr. Fu to participate in many of the programs that could reduce the amount of time he would spend in custody. He will serve his sentence under conditions harsher than those convicted of similar offenses.

Because Mr. Fu is a Chinese citizen, he would be considered deportable and not be eligible for an FPC placement[32]. He would be placed in a higher security facility that houses more violent offenders, has dual rows of razor-wired walls and much higher guard staffing.

In short, Mr. Fu could serve every day of any sentence imposed by the Court, and the quality of his incarceration will be much harsher than those convicted of comparable offenses.

---

[31] See, United States v. Knott, 638 F. Supp. 3d 1310, 1312 (M.D. Ala. 2022), where an autistic defendant was sentenced to 27 months of home detention for possession of CSAM: "the court finds that to incarcerate him would not only undermine the Sentencing Guideline's objective of uniformity in sentencing, but, depending on the magnitude of indifference of prison officials to his risk for assault, could also violate the Eighth Amendment." (Citations omitted).

[32] *Federal Bureau of Prisons Security Designation and Custody Classification Manual* 5100.08, Chapter 5, Page 9

## D. Deportation to China[33]

As a non-citizen, this felony conviction triggers mandatory removal proceedings under the Immigration and Nationality Act. Worse, Article 10 of the Criminal Law of the Peoples Republic of China allows Chinese courts to institute a domestic sentence if the individual has already served time abroad. Because Chinese judicial authorities maintain a strict "zero-tolerance" policy regarding child exploitation, local prosecutors retain the authority to bring new charges if they deem the U.S. penalty was insufficient to protect domestic public interests.

Article 98 establishes China's National Offender Database Integration, which legally mandates that the state establish and maintain a centralized, searchable information query system containing the records of anyone convicted of sexual assault, abuse, trafficking, or violent crimes against minors. This database provides the immediate cross-referencing mechanism used by the Public Security Bureau ("PSB") and prospective employers during the mandatory screenings required under Article 62.

### 1. Mandatory Surveillance and "Key Population" Tracking

Upon arrival at the border, the individual will be detained and processed by the PSB. They will immediately be integrated into China's comprehensive internal security apparatus:

- *Key Population System*: Individuals with criminal records for severe offenses—specifically sexual crimes or those targeting minors—are permanently flagged in national police databases.

[33] ICMEC-China-National-Legislation-updated-8-2020

- *Movement Restrictions*: The individual's national identification card, facial recognition data, and household registration will be linked to their record. They will be required to regularly report to local police stations, undergo periodic evaluations, and face severe tracking restrictions whenever they attempt to travel across provinces, check into hotels, or board high-speed transit.

### 2. Lifetime Professional and Employment Bans

In addition to the possibility of further prosecution by the Chinese government, because the instant conviction involves child exploitation, there will be mandatory employment screening and lifetime bans. China has significantly strengthened its statutory protections for minors, stripping individuals with these types of records of virtually all mobility in the workforce:

- *The Minors Protection Law*: Under this law, any establishment that operates in close contact with children—including schools, extracurricular tutoring centers, community centers, sports leagues, and healthcare providers—is legally obligated to perform mandatory background screenings on prospective employees.

- *Employment Disqualification*: A conviction related to child exploitation triggers a permanent, lifetime ban from working in any industry that involves children. Furthermore, they are legally barred from civil service, employment in state-owned enterprises (SOEs), or any corporate position of authority due to the standard "deprivation of political rights" that accompanies serious criminal assessments in China.

Article 62 of the PRC Law on the Protection of Minors mandates that any organization working in close contact with minors must conduct pre-employment criminal background checks and perform periodic re-screening of existing staff. It

legally bars the hiring or retention of anyone with a record of sexual offenses, abuse, trafficking, or violent harm against minors.

Article 126 provides the enforcement teeth for Article 62. It establishes severe administrative punishments—including fines, suspension of operations, or the total revocation of business licenses—for any organization that fails to run background query or proceeds to hire/retain an individual with a disqualifying criminal history.

Finally, the consequences of this conviction extend beyond personal liberty; they involve a deep sense of cultural and familial disgrace. In Chinese culture, the concept of "face" and collective reputation means that a single member's actions can cast a shadow over the entire family lineage. Mr. Fu is aware of the "shame" brought upon his parents and children. His family must now bear the social and emotional stigma of his decisions. This cultural "loss of face" represents a life sentence of social ostracization that will continue long after any judicial sentence is served.

### E. Changes in Life Circumstances Since the Offense

Since his arrest, Mr. Fu's life circumstances have dramatically shifted, reflecting both a commitment to legal compliance and proactive rehabilitation. Following his release on bond, Mr. Fu immediately addressed the core psychological issues that contributed to the offense conduct. He is consistently engaged in professional mental health treatment, actively working with specialists to manage and treat his previously undiagnosed mental health concerns.

In June 2024, Mr. Fu began outpatient mental health treatment with Lucien Thomson, a Licensed Clinical Social Worker and Certified Sex Offender Treatment Specialist at STAR-Sexual Trauma Recovery, Inc. ("STAR"). To evaluate Mr. Fu, Mr. Thomson administered comprehensive diagnostic assessments, including the

Hypersexual Behavior Inventory (HBI-19) and the Sexual Dependency Inventory-Revised (SDI-R 4.0). Significantly, neither assessment indicated elevated levels of hypersexual or sexually compulsive/addictive behaviors. Further evaluation utilizing the Personality Assessment Inventory (PAI) suggested DSM-5 diagnoses of Major Depressive Disorder, PTSD and Social Anxiety Disorder—clinical findings that directly align with Mr. Fu's extensive history of unresolved trauma.[34]

Until his treatment was interrupted by detention, Mr. Fu consistently and actively engaged in his therapy sessions. His treatment goals focused on accepting full responsibility, gaining insight into his behaviors, processing past trauma and anxiety, and developing functional communication skills. Mr. Thomson noted that Mr. Fu has been making measurable clinical progress in addressing his symptoms.

Critically, Mr. Thomson concurred with Dr. Westphal's assessment that Mr. Fu's accumulation of physical items, including weapons, was a direct manifestation of PTSD and a maladaptive response to his past violent victimization. Mr. Thomson observed that Mr. Fu described the accumulation as a compulsive, obsessive impulse to collect, entirely devoid of any intent to cause harm. Finally, Mr. Thomson expressed serious clinical concern regarding Mr. Fu's profound psychological vulnerabilities within a federal prison environment.

Mr. Fu has maintained strict compliance with all pretrial supervision and bond conditions. After losing his life-long career as a software engineer, Mr. Fu restructured his daily life around medical recovery, therapeutic intervention, and rebuilding stability

[34] Mr. Thomson's treatment summary (Attach., p. 033)

within the bounds of the law; demonstrating to the Court that he poses no risk of recidivism and is deeply committed to long-term rehabilitation.

This arrest has served as a painful but profound wake-up call, forcing Mr. Fu to directly confront his actions, their real-world consequences, as well as the underlying psychological problems he had long ignored. Mr. Fu has deeply reflected on the gravity of his conduct and the severe harm it causes. Crucially, he recognizes and openly acknowledges that his own personal and professional losses—while devastating to his future—are entirely secondary to the lifelong trauma inflicted upon child victims. Mr. Fu accepts full, unreserved accountability for his actions, expresses deep remorse, and carries a profound sense of shame for the pain and embarrassment he has brought upon his family, loved ones and the community.

### F. Very Low Risk of Recidivism

In his report, Dr. Westphal notes that "empirical literature consistently demonstrates that individuals charged with CSAM possession/distribution offenses have remarkably low recidivism rates." (Attach., p. 028). He writes that, "[m]eta-analyses indicate that approximately 4.6% of internet offenders commit any new sexual offense during follow-up periods, with only 2% committing contact sexual offenses and 3.4% committing new CSAM offenses." And he explains that Mr. Fu is at an even lower risk of reoffending:

> Mr. Fu's risk profile places him at the lower end of even these already low base rates due to several key protective factors, including his complete absence of prior criminal history, no history of contact sexual offenses, higher education level with a master's degree, and notably, his lack of antisocial personality traits. Dr. Haworth specifically observed that he doesn't have "an antisocial bone in his body" and noted his tendency to actively avoid places with children despite living in a neighborhood with them.

> For Mr. Fu specifically, several factors make progression to contact offenses highly unlikely, *particularly his autism spectrum disorder which appears to function as a protective rather than risk factor*. His profound social communication deficits, preference for solitary activities, extreme discomfort in social situations, and active avoidance of interpersonal contact all serve to minimize any risk of contact offending. Research indicates that individuals with ASD may view CSAM as a way to understand relationships and sexuality rather than as a precursor to sexual offending behavior toward minors. [Emphasis added].

(Attach., p. 028).

Dr. Westphal found that Mr. Fu "represent[s] the lowest risk category within an already low-risk population" and that "[h]is case exemplifies why experts emphasize the need for diversion programs and mental health courts for individuals with ASD charged with CSAM offenses, as they require intervention and support rather than purely punitive approaches." Dr. Westphal concluded: "I am confident with the right support he is at a very low risk for recidivism" and that "punishment and rehabilitation would be best achieved outside of an institutional environment because of his particular vulnerabilities attributed to autism." (Attach., p. 029).

## IV. Conclusion

Over the past two years, Mr. Fu has demonstrated a steadfast commitment to comprehensive rehabilitation and absolute legal compliance. He has been fully compliant with the terms and conditions of pretrial release. He has been actively and consistently engaged in specialized outpatient therapy with Mr. Thomson a STAR. This clinical intervention focuses heavily on ownership of his past actions, strict impulse control, and cultivating a deep understanding of the traumatic impact of his offenses on victims. Through this process, Mr. Fu is actively developing the emotional regulation and behavioral skills he previously lacked, providing him with the psychological tools necessary to ensure he never reoffends.

Parallel to his clinical treatment, Mr. Fu has engaged in a significant spiritual and moral renewal. He has returned to his Buddhist faith, anchoring his daily routine in spiritual practices, the traditional hand-copying of sutras, meditation, and active repentance to foster deep moral reflection and personal growth. Throughout this two-year period, Mr. Fu has remained fully committed to his rigorous treatment plan, a dedication bolstered by the consistent, unwavering support and close supervision of his family. Ultimately, his efforts have yielded measurable, documented clinical progress; he has maintained a flawless compliance record under supervision and has remained completely offense-free since his initial arrest.

Yang Jiang has known Mr. Fu for 36 years, describing him as a kind, humble dependable. She highlights a personal story where Mr. Fu went out of his way in China to help her family when her father was diagnosed with cancer. Ms. Jiang emphasizes that Mr. Fu expressed genuine remorse without making excuses and spent the past 28 months actively engaging in mental health therapy to address his past mistakes and heal (Attach., p. 037).

Yun Ling has known Mr. Fu for over 25 years. He describes Mr. Fu as a kind, quiet, and dependable person. He highlights warm family memories, such as Mr. Fu patiently playing with his children, cooking meals for the family and planning local outings when they visited. Mr. Ling notes that Mr. Fu has shown genuine remorse. Over the past 28 months, Mr. Fu has stayed actively engaged in therapy to treat his trauma, depression, anxiety, and ASD, showing a strong commitment to building coping skills and preventing future missteps (Attach., p. 39).

Mr. Fu deeply appreciates the opportunity to address the Court and does so with full awareness of the gravity of his actions and the profound harm they cause. He now

fully understands that the materials he possessed involved real children—real victims—whose lives were permanently affected. Mr. Fu is deeply ashamed that his behavior played a role in their suffering. He takes absolute responsibility for his actions and expresses his sincere, heartfelt remorse to the Court, the community, and all those affected by his conduct.

Mr. Fu respectfully requests that the Court consider the following mitigating factors in fashioning an appropriate sentence: his lack of any prior criminal history, his prompt acceptance of responsibility, his timely notice of intent to plead guilty, and his full, truthful disclosure of all information and evidence pursuant to U.S.S.G. § 3E1.1(b). Furthermore, Mr. Fu has demonstrated exemplary pretrial compliance and a steadfast commitment to post-arrest rehabilitation.

Accordingly, Mr. Fu prays this Court grant his Motion for a Downward Variance and impose a non-custodial sentence. Such a disposition is sufficient, but not greater than necessary, to fulfill the statutory goals of sentencing, and represents a just punishment carefully tailored to his actual role in the offense and his unique personal history characteristics under 18 U.S.C. § 3553(a).

Respectfully submitted,

______________________________
THE HENRY LAW FIRM
By: Todd Edward Henry, Esquire
Attorney for Defendant

DATED: July 22, 2026

**CERTIFICATE OF SERVICE**

I, Todd Edward Henry, Esquire, hereby certify that I am on this 22nd day of July 2026 electronically filing the defendant's Sentencing Memorandum and Motion for Downward Variance using the CM/ECF System, which will automatically send notification of same to all counsel of record.

______________________________
THE HENRY LAW FIRM
By: Todd Edward Henry, Esquire
Attorney for Defendant

DATED: July 22, 2026

# ATTACHMENTS

Alexander Westphal, MD, PhD

16 Railroad Place, 10012
Westport, CT 06880

Telephone (203) 936 8786
Fax (888) 342 1837
Alexander.Westphal@Yale.edu

February 21, 2026

Mr. Fred Sosinsky, Esq.
45 Broadway #3010
NY, NY 10006

**RE: Mr. WEI FU (DOB: April 24, 1986)**

Dear Mr. Sosinsky,

I am an Adjunct Associate Professor in the Division of Law and Psychiatry at Yale School of Medicine. I am a practicing physician with residency training in general psychiatry and fellowship training in child and adolescent and forensic psychiatry. I am certified by the American Board of Psychiatry and Neurology in all three specialties. My clinical and research focus is on Autism Spectrum Disorder (ASD), with a particular emphasis on the assessment and management of problematic behaviors that can be associated with ASD. I have attached a current CV.

At your request, I examined Mr. Wei Fu during four meetings, spanning November 2024 through May 2025. All meetings were conducted remotely using Yale's HIPAA compliant telehealth platform. The purpose of the evaluation was to complete a psychiatric assessment to determine whether there were aspects of his developmental and mental health history that may have been relevant to the behavior that led to legal charges. To this end, I conducted a comprehensive psychiatric assessment. Mr. Fu already had diagnoses of Post Traumatic Stress Disorder, Major Depressive Disorder and Generalized Anxiety Disorder. Because of the concern that Mr. Fu exhibited signs and symptoms of Autism Spectrum Disorder raised by his lawyer, I also conducted specific diagnostic testing to address this. In addition to meeting with Mr. Wei Fu and his legal representatives, I was in contact with the following individuals regarding the case:

1. Shin Yao Fu (his father)
2. Yaning Jiang (his mother)
3. Thomas Haworth, PhD (Forensic Psychologist)
4. Zaman Tauhid, MD (Psychiatrist)

5. Lucien Thomson, LCSW (Social Worker, Sex Offender Specialist)

In the following report, all quotes are from Mr. Wei Fu unless attributed to someone else explicitly.

I also reviewed the following files related to the case I received from your office:

1. 918B 2020.pdf: A U Non-immigrant Status Certification form from 2020 regarding a past crime victim incident.
2. 918B police report.pdf: Another version of a U Non-immigrant Status Certification form related to a past crime victim incident in Jersey City in 2012, including a description of the assault and injuries.
3. School Police Report.pdf: A letter from the Chief of Police at Stevens Institute of Technology confirming Wei Fu was the victim of an assault and robbery in 2012.
4. Surgery Record.pdf: The operative record detailing a retinal reattachment surgery performed in 2012.
5. AASI.pdf: Information and interpretation guidelines for the Assessment of Adult Sexual Interest (AASI), a self-report measure of sexual arousal to different age categories.
6. BDI.pdf: Results of the Beck's Depression Inventory questionnaire.
7. BHS.pdf: Results of the Beck Hopelessness Scale questionnaire.
8. EDPA Warrant.pdf: Application and affidavit for a federal search warrant for electronic devices, detailing an investigation involving child sexual abuse material (CSAM)[1] and peer-to-peer file sharing activity.
9. Fei Wu.pdf: Email containing a report from a therapist (Lucien Thomsen, LCSW, CSAT-S, CMAT-CD, CSOTS) at STAR, an outpatient treatment program for problematic sexual behaviors, summarizing an initial assessment and therapy goals.
10. MCMI-IV-Interpretive-Report_58759825_1713893245304.pdf: An interpretive report for the Millon Clinical Multiaxial Inventory-IV (MCMI-IV), assessing personality patterns and clinical syndromes, suggesting possible diagnoses like major depressive disorder, PTSD, and social anxiety disorder.
11. MMPI-3-Interpretive-Report_-Clinical-Settings_60006931_1717604831272.pdf: An interpretive report for the Minnesota Multiphasic Personality Inventory-3 (MMPI-3), assessing validity, somatic/cognitive dysfunction, emotional dysfunction, and interpersonal functioning.
12. Medical Records.pdf: Medical documentation listing prescribed medications and diagnoses including Post-traumatic stress disorder (chronic), Major depressive disorder (single episode, severe without psychotic features), and Generalized anxiety disorder.
13. Psychiatrist medical records1.pdf: An initial psychiatric evaluation note from Nathan Kadan, detailing history, symptoms related to trauma, work stress, and functional impairment, and providing initial diagnoses and medication prescriptions.
14. Psychiatrist medical records2.pdf: A follow-up psychiatric note from Nathan Kadan.
15. Psychiatrist medical records3.pdf: A follow-up psychiatric note from Nathan Kadan.
16. Psychiatrist medical records4.pdf: A follow-up psychiatric note from Nathan Kadan.

---

[1] Throughout this report I use the term CSAM (child sexual abuse materials) rather than the more common but inappropriate term child pornography, which, in my opinion, validates the action by placing it on a categorical continuum with adult pornography, which is legal.

17. Psychiatrist medical records5.pdf: A final psychiatric note from Nathan Kadan.
18. Search warrant.pdf: A state search warrant document.

## CONFIDENTIALITY

At the beginning of my examination of Mr. Fu, I explained the purpose of the examination and that my findings would be released to you and might be incorporated into any judicial hearings. Thus, the usual doctor-patient confidentiality did not exist in this examination. I explained that I would not be treating him. I explained that I was a mandatory reporter and the significance and ramifications of that. Mr. Fu consented to participating in the assessment and releasing my findings to you.

## BACKGROUND INFORMATION

Mr. Wei Fu was a 38-year-old male born on April 24, 1986, in the Shandong Province of China, where he also grew up. He moved to the US as an adult for post-college education and remained in the US on a visa. He was an only child. His parents were both alive and, while they typically lived in China, they were staying with him in the United States since March 2024, to offer support.

## FAMILY HISTORY OF PSYCHIATRIC DISORDERS

Mr. Fu reported a family history of psychiatric and developmental issues. His mother suffered from an Anxiety/Panic Disorder and Depression. On his mother's side, both of her elder brothers experienced issues with depression and anger control. One of these brothers had a daughter (a cousin) who was currently suffering from depression and anxiety; she also struggled academically in the Chinese education system when she was younger. The other brother's daughter (another cousin) was described as having an unstable character or mental status, sometimes exhibiting extreme anger or irritability, and viewing things in an extreme way, which might have suggested paranoia. Finally, a relative from his mother's more distant side, specifically a cousin's son (a second cousin), may also have exhibited symptoms of autism, avoiding social interaction and preferring to stay at home to do his own activities.

On his paternal side, Mr. Fu's cousin (paternal nephew) experienced significant learning problems, particularly with reading and math, and struggled academically to the point of dropping out of middle school due to these difficulties. This same cousin also experienced speech issues. Mr. Fu believed this cousin may have been intellectually disabled, although he was not aware of any formal evaluation. Furthermore, this cousin reportedly was unwilling to talk with others, especially when significant events occurred, and did not share his feelings. This cousin committed suicide in the early 2000s. Also, Mr. Fu's father's grandfather reportedly suffered from some psychiatric issues, spoke very little, was unwilling to speak to others, preferred to stay home working on his own projects, and at times forgot to eat or take care of himself. Mr. Fu's father's other brother had a daughter (another cousin) who struggled academically and did not pass the college entrance exam in China.

**EARLY DEVELOPMENTAL HISTORY**

Wei Fu was born in China, in Shandong Province, on April 24, 1986. His parents were in their later 20s when he was born. He was an only child and lived at home with his parents throughout his childhood, including middle school and high school, only leaving home when he went to university. His parents were married and spoke Mandarin. His father worked in plastic manufacturing, including making bags for concrete or sand, and was a sales manager. His mother worked in construction material trading. They were both retired at the time of this evaluation.

Mr. Fu suffered from ear infections during elementary school. He noted that his right ear showed weaker hearing compared to his left, which was the ear that suffered a recurring infection. He also underwent two major surgeries as a child. He described these as being for a "genetic failure" or "natural born issue" related to his testicle, likely a hydrocele and an undescended testicle. The first surgery around 4-5 years old failed, and a second surgery around 7-8 years old was successful in fixing the issue. He underwent full sedation during these surgeries. He reported no history of head injury prior to the incident described later in this report when he was an adult.

His mother provided some estimations of his early developmental milestones. She recalled him sitting up without help around one year old. She did not remember him crawling forward but thought he might have crawled backward around 8 or 9 months old. He walked around one and a half years old and walked upstairs around two years old. He spoke his first words around one year old, short phrases (3-4 words) around one and a half to two years old and spoke in sentences near 3 years old. He was reportedly fully bladder and bowel trained around four years old, although bedwetting happened frequently before age four and a couple of times after age seven.

In terms of temperament and early social behavior, Mr. Fu described himself as not enjoying cuddling very much but was easy to calm down when he was upset as a child. He was also easily irritated by small things. He recalled one specific memory from when he was a few years old, becoming frustrated and throwing a small puzzle toy because he could not finish it. He generally preferred to play by himself and enjoyed doing his own activities, although he could play with others if they were around.

**SCHOOL AGE**

Mr. Fu attended public school in Shandong Province. He received no special education or extra support at school. He was also never given any diagnosis of any kind as a child, although he noted that the concept of mental health issues was not prevalent in China at that time and problems were often viewed as bad habits. His family moved houses once when he was around 11 to 12 years old, which coincided with him starting middle school.

Academically, he described himself as an "okay" student in elementary school, ranking in the middle to top of his class. However, his academic performance declined significantly in middle school, placing him near the bottom of his class. He reported problems getting along with people at school and was specifically targeted for bullying in middle school. He described himself and other students who followed the rules as being the targets, considered "weak people" by the students who started trouble. He found it hard to maintain friendships.

He stated that high school in China was very tough academically, but noted it was better than middle school regarding bullying. Discipline at home sometimes involved punishment, which he viewed as part of Chinese tradition and consistent with what other children experienced in that area at the time. His interests during his school age years included drawing and assembling models and World War II history.

**ADULTHOOD**

Following school, Mr. Fu studied at Dalian Jiaotong which is a public university in Dalian, Liaoning, China. It is a competitive university affiliated with China's Ministry of Transport. He focused on computer software engineering. He moved to the United States in January 2012 to pursue graduate studies in computer science. He enrolled at Stevens Institute of Technology in Jersey City, New Jersey. Stevens is also a competitive academic environment. He was in his mid-20s at the time.

Shortly after arriving, on September 26, 2012, while walking home in Jersey City, Mr. Fu was the victim of a violent crime. He was robbed and beaten by three unknown males. This assault resulted in significant injuries, including lacerations to his face, elbow, and knee. Critically, a kick to his right eye caused a retinal detachment, leading to the loss of vision in that eye. He underwent retina reattachment surgery, described in the record as a scleral buckling and vitrectomy surgery. Despite the surgery, the vision in his right eye suffered permanent damage; he described his vision as blurry beyond two feet. A police investigation into the attack was opened and remained active, but the perpetrators were not found.

In the immediate aftermath of the attack, Mr. Fu moved to a new apartment within days. He resided in this apartment for approximately four years. Around this time, he also began the lengthy process of applying for a U visa, available to certain crime victims who assist law enforcement. The U visa process required him to remain physically present in or close to the city where the crime occurred in case police needed his cooperation. Furthermore, due to the sensitive nature of his eye surgery, specifically a bubble injected into his eye, he was medically advised to avoid flying for five to seven years, further restricting his movement. The U visa was eventually approved around 2018.

Academically, Mr. Fu completed his Master's degree in Computer Science from Stevens Institute of Technology in 2014. Following graduation, he secured employment as a software engineer at a financial company in New Jersey, Lord Abbett, working there from 2014 until around 2017. This job was located near his apartment. Around 2016, he moved to a different apartment in New Jersey. This move was prompted by an expected visit from his parents, as his initial apartment was a small studio with insufficient space for them. In 2017, he experienced a layoff from Lord Abbett, leading him to find a new position as a software engineer at Cox Automotive. This new role was remote, allowing him flexibility in location after his U visa was approved.

Mr. Fu began acquiring firearms and knives, starting around 2017 or 2018. This decision was linked to a feeling of being unsafe in the apartment he moved to, particularly after witnessing police activity there. He described the acquisition as feeling addictive. He estimated spending over $200,000 on firearms over the next 5 years, money which came from his parents, credit

cards, and savings. He reported that his parents gave him close to $100,000 for a house renovation, after he purchased a house in Pennsylvania in 2021.

**SOCIAL HISTORY**

Throughout his post-high school years, Mr. Fu had ongoing social difficulties. While he could interact with others when necessary, he generally preferred solitary activities and doing his own things. He found meeting new people difficult, actively avoided crowded situations, and felt extremely uncomfortable at social gatherings. He did not consistently maintain eye contact, preferring to avoid it if possible. Evaluations in adulthood (described in more detail below in the collateral interviews section, among others) described his social skills as childlike, noting significant difficulties in social functioning, interpersonal relationships, coping skills, and forming/maintaining friendships. He was described as socially naive, socially awkward, and struggled with understanding social cues and others' perspectives. Testing suggested traits consistent with Dependent, Avoidant, and Schizoid personality styles, characterized by disliking the company of people, preferring solitude, avoiding social situations, and difficulty with close relationships. He also scored significantly for loneliness, although he developed solitary interests (like academics and music) to cope. Inflexible thinking was identified as a prominent trait, associated with intense interests and difficulty shifting perspectives. His tendency for "deep dives" or monotropism, focusing intensely on specific topics, was noted, something which could cause problems in conversations with others. He also displayed difficulties in problem-solving and foreseeing the consequences of his actions, particularly in social contexts.

**ROMANTIC RELATIONSHIP HISTORY**

Mr. Fu is a single, heterosexual male who never married. He stated that he never been in a romantic relationship and never had a girlfriend, noting that talking with girls was somewhat troublesome for him in college. Assessments and self-report indicated that he preferred to be alone, did not enjoy social events, avoided social situations, was socially introverted, struggled with forming close relationships, was emotionally restricted, and was shy, easily embarrassed, and uncomfortable around others. These social characteristics were noted as contributing to a lack of typical romantic relationship development.

**PORNOGRAPHY**

Mr. Fu's first exposure to pornography occurred at a young age. He stated that the very first time he looked at general pornography was perhaps around nine years old. This initial exposure was not on a computer, but on a video tape. His parents rented the video tape and hid it somewhere in the house, and he found it accidentally while searching around when they were alone. He noted that at that time, he did not know it was pornography.

His regular viewing of general pornography began later, starting in high school, when he gained access to a computer. Mr. Fu also spoke about his first exposure to CSAM. He stated that he started viewing images of child exploitation in the year prior to his March 2024 arrest. He clarified this, saying he did not know it was illegal at the time because it was within the adult pornography he was collecting. He estimated this was probably around 2022 or 2023. He said he

did not use specific search terms for illegal material, but it came up along with regular search terms like "young girl" in group downloads of adult pornography.

He maintained that he primarily downloaded adult pornography and collected large amounts of it, sometimes not opening files or deleting unwanted content to save space. He denied having an inherent interest in CSAM, explaining that his adult pornography use led to exposure to child images, and that he did not understand the harm or significant illegality of his behavior.

**OTHER RELEVANT HISTORY**

Mr. Fu denied any history of previous legal involvement (outside of as a victim of crime, discussed above.) He denied any substance use history.

**INDEX OFFENSE**

In March 2024, law enforcement, including Homeland Security Investigations and the Pennsylvania Office of Attorney General, executed a search warrant at his residence in Easton, Pennsylvania, based on an allegation of illegal internet activity. Mr. Fu consented to an interview, admitted to having images of child exploitation on his personal computer, and discussed using P2P file sharing programs like UTorrent. Forensic analysis found approximately 4,500 images of child sexual abuse material on seized devices, along with adult pornography. He was indicted by a federal grand jury on July 9, 2024, for one count of distribution of a visual depiction of child sexual abuse and was arrested on July 11, 2024. The potential penalty for this charge was a minimum of 5 years and a maximum of 20 years imprisonment, plus lifetime registration requirements. His parents traveled from China to support him following his legal issues starting in March. His employment as a software engineer was impacted in July 2024 when his bail condition prevented him from using a computer.

**HISTORY SINCE ARREST**

Following his legal troubles, Mr. Fu sought mental health treatment for the first time. He was evaluated and began treatment with psychiatrist Nathan Kadan in August 2024 for depression, anxiety, and PTSD. The PTSD diagnosis was linked to the 2012 attack. He also reported symptoms of OCD, specifically a preoccupation with hand washing. Psychological testing (MCMI-IV in April 2024, MMPI-3 in June 2024) conducted by Thomas Haworth, PhD, corroborated significant symptoms of Major Depression, Generalized Anxiety, Somatic Symptom Disorder, and PTSD, along with personality features like dependence, avoidance, schizoid traits, demoralization, helplessness, self-doubt, anxiety, worry, compulsive behavior, social avoidance/anxiety, and passive behavior. The MMPI-3 also noted a high risk for suicidal ideation, although he denied intent. Nathan Kadan eventually referred him to a forensic psychiatrist in October 2024 after Mr. Fu disclosed his legal issues. He subsequently began treatment with another psychiatrist, Dr. Zaman Tauhid, in October 2024 for depression and anxiety, receiving medication (Sertraline/Zoloft and Prazosin), though Dr. Tauhid was reportedly not informed about the legal case. He also attended a few sessions in person with a sex offender therapist, Dr. Lucien Thomson, using a treatment program for problematic sexual behaviors, but this therapy was interrupted by his travel restrictions related to the arrest. They have continued to

meet remotely, initially by computer, but now by phone. Conversations with Drs. Haworth and Tauhid, and Mr. Thomson are described below.

**COLLATERAL INTERVIEWS**

**Thomas Haworth, PhD**

Dr. Haworth initially saw Mr. Fu in April of 2024. He conducted an initial interview and consultation, and also interviewed his parents. He noted that the interview with the parents was difficult due to their limited English, and required a translator. He conducted further visits with Mr. Fu in May and August of 2024, and also held consultations with the attorneys. He mentioned Mr. Fu changed counsel multiple times. Regarding assessments, Dr. Haworth performed an AASI screen (Assessment of Sexual Interest), the BDI (Beck Depression Inventory), the BHS (Beck Hopelessness Scale), an MMPI-3 (Minnesota Multiphasic Personality Inventory) and an MCMI-IV (Millon Clinical Multiaxial Inventory). He noted some validity problems with the MMPI-3 but found it interpretable. Dr. Haworth shared his global impression of Wei Fu, saying that many of his behaviors could be attributable to OCD (Obsessive-Compulsive Disorder). He found Wei Fu's presentation somewhat confounded by cultural components. However, he observed many indicators for OCD, particularly related to purchasing and collecting. He described Wei Fu as buying hundreds of guns and ammunition, and exercise equipment, but never taking them out of the packaging, leading to his house being loaded with stacked-up items. Dr. Haworth hypothesized that this compulsion to collect extended to his exposure to pornography, where he went down "rabbit holes" and started to "dig deeper and collect because it's kind of what he does". He reiterated that the dominant presentation was "a kind of obsessive compulsive hoarder thing." We discussed whether Wei Fu is autistic. He said that while Mr. Fu did not seem to have a solid group of friends, he associated with people who shared similar interests, which could contribute to an understanding of him being on the spectrum. However, Dr. Haworth noted that he seemed to exhibit some reciprocity that was available and palpable during their in-person communication, handling the room "fairly comfortably" despite being anxious and straightening things occasionally. I asked about Wei Fu's lack of romantic relationships as a marker of autism, Dr. Haworth agreed but also suggested that this absence of romantic relationships was often times indicative of schizoid personality disorder. He considered it as a feature to inquire about for ruling in/out diagnoses. He thought that Wei Fu's relative isolation and keeping to himself, with a capability for "hyperfocus that's like beyond the stars" fit with autism. He again mentioned the confounding factors of culture and whether the isolation was a matter of being "different". While he has worked with many international students who find peer groups, it was clear that Wei Fu's social life was very limited, even before his current isolation due to the charges. Regarding Post-Traumatic Stress Disorder (PTSD), Dr. Haworth stated that the assault Wei Fu suffered "certainly would likely have some PTSD" and that it was diagnosable in him. He believed that part of collecting weapons was a response to that attack. We discussed the risk of recidivism. Dr. Haworth stated that the literature was "pretty robust" on this topic, particularly for online-only CSAM offenders. He asserted they possessed a "relatively low risk for transferring over to contact offending" unless there was some antisociality. He thought a level of antisociality was needed to "cross over" to contact offending. Dr. Haworth stated he did not think Wei Fu possessed "an antisocial bone in his body" and described him as a

"pretty mild mannered," "cooperative" person. He also observed that Wei Fu avoided places with children despite living in a neighborhood with children.

**Tauhid Zaman, MD**

According to a statement from Dr. Zaman, Wei Fu was his patient but self-discharged from treatment after 2 months. He stated that the patient's main focus at every appointment was getting short-term disability (STD) paperwork completed. However, Dr. Zaman's company policy required 6 months of treatment engagement before processing STD paperwork. Dr. Zaman's primary assessment of Wei Fu was that he met the criteria for chronic PTSD, Major Depressive Disorder (MDD), and Generalized Anxiety Disorder (GAD), which was also reflected in Dr. Zaman's medical records from Lifestance Health Pennsylvania. Wei Fu reported symptoms including nightmares, flashbacks, and hypervigilance related to the physical assault that occurred in 2012, and that worsening depressive and anxiety symptoms were impacting his ability to work as a software engineer. He also reported remaining socially isolated and experiencing anxiety in public settings. Dr. Zaman believed Mr. Fu might benefit from a trial of SSRI and Prazosin, and they tried Lexapro 20 mg and Prazosin at bedtime. Wei Fu reportedly saw improvement in his mood symptoms after 1-2 months on these medications. Despite the symptoms, Dr. Zaman advised him to consider returning to work part-time or in a less demanding role. Dr. Zaman's professional opinion was that Wei Fu did not show severe symptoms preventing him from obtaining employment or returning to his job of 7 years. He found Wei Fu to be a very difficult patient due to the patient's consistent focus on STD paperwork rather than engaging in treatment. Dr. Zaman noted that Wei Fu did not engage in treatment and missed several appointments after the initial period.

**Lucien Thomson, LCSW**

Mr. Thomson is a Licensed Clinical Social Worker and Certified Sex Offender Treatment Specialist at STAR, an outpatient treatment program for problematic sexual behaviors. He began assessing and treating Wei Fu in June 2024. He perceived Wei Fu as genuine and honest regarding his history and the events leading up to his legal issues. Wei Fu reported discovering the charged behavior accidentally and developing from there. Specific assessments conducted by Mr. Thomson, including the Hypersexual Behavior Inventory (HBI-19) and the Sexual Dependency Inventory-Revised (SDI-R 4.0), did not indicate elevated levels of hypersexual behaviors or sexually compulsive/addictive behaviors. The Personality Assessment Inventory (PAI) suggested possible DSM-5 diagnoses of Major depressive disorder, Posttraumatic stress disorder, and Social anxiety disorder, which aligned with Wei Fu's self-reported history of trauma and current symptoms. Wei Fu denied any history of sexually deviant behaviors or interests, antisocial behaviors, substance or alcohol abuse, relationship or employment problems, aggression or violence, or past legal system involvement. Wei Fu actively engaged in therapy sessions focused on goals such as accepting responsibility, understanding sexual behaviors, addressing trauma and anxiety, and developing communication skills, and he began making progress in addressing his symptoms before sessions were interrupted by detention. Mr. Thomson agreed with the perspective that Wei Fu's accumulation of weapons was a reflection of PTSD and a maladaptive response to trauma, noting that Wei Fu described it as an impulse or obsession to collect, not intent to harm. He was concerned about Wei Fu's vulnerabilities in

federal prison and hoped this would be considered for sentencing. He stated that assessing for autism was not his area of expertise but that the diagnosis made sense to him.

**DIAGNOSTIC FORMULATION**

Based on the sources and our conversation history, I concluded that the following diagnoses were relevant to Mr. Fu. I explain my rationale for each of these below.

- Autism Spectrum Disorder (ASD)
- Post-Traumatic Stress Disorder (PTSD)
- Rule out Obsessive-Compulsive Disorder (OCD)
- Rule out Schizoid Personality Disorder
- Rule out Major Depressive Disorder
- Rule out Generalized Anxiety Disorder

**AUTISM SPECTRUM DISORDER ASSESSMENT**

AUTISM DIAGNOSTIC OBSERVATION SCHEDULE-2 (ADOS-2) / BRIEF OBSERVATION OF SYMPTOMS OF AUTISM (BOSA)

Portions of the Autism Diagnostic Observation Schedule-2 (ADOS-2) and a complete Brief Observation of Symptoms of Autism (BOSA) were administered on January 22, 2025, to directly observe Wei Fu's social communication behaviors and restricted interests in a semi-structured setting. The ADOS-2 represents the gold standard for autism diagnostic observation, providing standardized activities designed to elicit behaviors characteristic of Autism Spectrum Disorder. The BOSA served as a validated adaptation of the ADOS-2 for telehealth administration, allowing for remote assessment while maintaining the diagnostic integrity of the original instrument.

Given Wei Fu's fluent speech capabilities, Module 4 of the ADOS-2 and the F2 version of the BOSA were selected, both designed specifically for adolescents and adults with developed language skills. The BOSA assessment utilized a series of interactive games and structured conversations to create natural opportunities for social interaction and communication. Activities included playing Slap Jack with cards, building with Jenga blocks while engaging in conversation prompted by question cards, and playing the Suspend game while alternating between asking and answering questions. These activities were interspersed with periods of semi-structured conversation, including discussions of his interests.

Throughout the assessment, Wei Fu demonstrated several notable patterns in his social interaction style. His eye contact during social exchanges was markedly limited, often looking away or focusing on the game materials rather than making natural eye contact with the examiner. He showed minimal spontaneous social overtures, rarely initiating social interactions beyond the structured requirements of the activities. His reciprocal social responses were similarly reduced, often providing brief or tangential responses that failed to build upon the social momentum of the interaction. This pattern contributed to an overall sense of reduced

social rapport, making the interaction feel somewhat one-sided despite his compliance with the structured activities.

His communication style revealed both strengths and significant challenges. While Wei Fu possessed adequate vocabulary and could engage in conversation about topics of interest, his speech patterns tended toward verbose and tangential directions that sometimes lost connection to the original topic. He demonstrated limited awareness of his listener's level of engagement, continuing to elaborate on details even when the examiner showed signs of wanting to redirect the conversation. His use of communicative gestures was notably reduced, relying primarily on verbal communication without the natural hand movements and facial expressions that typically accompany social conversation. Although his conversational content was generally appropriate, the reciprocal quality of the exchanges was poor, with limited back-and-forth dialogue.

The assessment also revealed clear evidence of restricted and repetitive behavioral patterns. Wei Fu demonstrated an intense focus on specific details within activities, becoming absorbed in particular aspects of the games while losing sight of the broader social purpose of the interaction. He reported extensive collecting behaviors with highly specific organizational criteria, describing detailed systems for categorizing and managing his collections. His strong preference for solitary activities became apparent through his descriptions of how he spent his time, with limited mention of shared interests or collaborative pursuits. Throughout the assessment, his attention consistently gravitated toward minute details rather than understanding the overall gestalt of situations, reflecting a cognitive style characteristic of autism spectrum conditions.

These direct observational findings were strongly corroborated by data from the Vineland-3 adaptive behavior assessment completed by his parent. The Vineland-3 revealed profound impairments in socialization, with v-scale scores of 1 across all social subdomains, representing functioning well below the 1st percentile for his age group. The maladaptive behavior domain showed clinically significant internalizing problems and elevated externalizing concerns. Multiple critical items were endorsed, including frequent fixations on objects or topics, repetitive speech patterns and physical movements, and compulsive behaviors, all of which aligned with observations made during the ADOS/BOSA administration.

The behavioral observations obtained through the ADOS-2/BOSA assessment are consistent with the diagnostic criteria for Autism Spectrum Disorder as outlined in the DSM-5. Wei Fu demonstrated persistent deficits in social communication and social interaction across multiple contexts, evidenced by his challenges with social-emotional reciprocity, nonverbal communicative behaviors, and developing and maintaining relationships appropriate to his developmental level. Additionally, he showed clear evidence of restricted, repetitive patterns of behavior, interests, and activities, including highly focused special interests, adherence to specific routines, and atypical sensory processing. The convergence of direct observational data with historical information and caregiver report provides compelling evidence supporting an autism spectrum disorder diagnosis.

VINELAND ADAPTIVE BEHAVIOR SCALES-3 (VINELAND-3)

The Vineland-3 was administered on March 31, 2025, based on parent/caregiver report to assess Wei Fu's adaptive functioning across daily life skills. A Mandarin speaking translator was used, but despite this the exam took 5 hours to administer, an unusually long time. This standardized measure evaluates an individual's practical abilities in real-world settings rather than optimal performance under testing conditions.

*Overall Adaptive Functioning:* Wei Fu's overall adaptive behavior composite score of 34 falls significantly below the normative average of 100, placing him below the 1st percentile compared to same-age peers. This indicates that his general adaptive functioning is lower than 99% of individuals in his age group, representing a profound deficit in everyday life skills.

*Communication Skills:* Wei Fu demonstrates marked difficulties in communication, earning a domain standard score of 27. His greatest challenges lie in understanding and expressing information verbally. Receptively, he requires multiple repetitions to comprehend spoken instructions or respond to verbal communication, suggesting significant processing difficulties. His expressive language is similarly impaired, with particular struggles using pronouns correctly in English, though this appears less problematic in his native Chinese. In contrast, his written communication skills represent a relative strength.

*Daily Living Skills:* This domain represents Wei Fu's area of relative strength, though his standard score of 43 remains well below average. His personal care skills are significantly impaired, with ongoing difficulties in basic self-care tasks such as remembering to turn off water during bathing and maintaining adequate hygiene. Household management presents moderate challenges, as he requires prompting to complete chores and demonstrates limited initiative in meal preparation and home maintenance. However, his community functioning shows the most competence within this domain, for example, he can make purchases, obtain information from media sources, and navigate using a car.

*Socialization:* Socialization represents Wei Fu's most significant area of impairment, with a standard score of only 20. He demonstrates pervasive difficulties across all aspects of social functioning. His interpersonal relationships are severely compromised, with minimal ability to engage in reciprocal social interactions, maintain friendships, or demonstrate appropriate social responsiveness. He shows little interest in recreational activities with others and avoids group participation. His coping skills in social situations are equally impaired, with poor emotional regulation and limited ability to navigate social conflicts or unexpected changes.

*Behavioral Concerns:* The assessment reveals clinically significant internalizing behaviors, including excessive dependency, eating difficulties, and sleep problems. Externalizing behaviors are elevated, particularly regarding an inappropriate interest in weapons or violence. Several critical behavioral items occur frequently, including intense fixations on objects or topics that interfere with daily functioning, repetitive speech patterns and physical movements, compulsive behaviors, and concerning sensory processing issues such as apparent indifference to pain.

*Clinical Implications:* The Vineland-3 results indicate profound adaptive functioning deficits that significantly impact his ability to function independently across all major life domains. The severity of his socialization difficulties, combined with his communication challenges and the presence of multiple concerning behaviors, indicates a need for comprehensive support services and structured intervention planning to maximize his functional independence and safety.

Taken together, these Vineland-3 scores, particularly the very low Socialization and Communication domains, indicate that although Mr. Fu is a chronologically 38-year-old man with high intellectual ability, his overall adaptive functioning – that is, his practical, social, and communication skills in day-to-day life – is broadly comparable to that of a late-elementary-school child, in the 8–10-year-old range.

AUTISM DIAGNOSTIC INTERVIEW-REVISED (ADI-R)

The Autism Diagnostic Interview-Revised (ADI-R) is a comprehensive, standardized diagnostic instrument designed to assess individuals suspected of having Autism Spectrum Disorder through detailed developmental history. This semi-structured interview is administered to a parent or primary caregiver who has known the individual since early childhood and can provide reliable information about the person's developmental trajectory from infancy through current functioning. This exam was partly administered with Mr. Fu’s father, using Wei Fu as the translator, and later with both of his parents, again using him as the translator.

The ADI-R serves as the gold standard for obtaining systematic developmental history relevant to autism diagnosis and is widely recognized as one of the most reliable and valid tools for this purpose. Unlike direct observational measures such as the ADOS-2, the ADI-R captures historical information about behaviors and development that may not be observable during a single assessment session, providing context about the onset, course, and persistence of autistic features over time.

The interview focuses on the three core symptom domains that define Autism Spectrum Disorder according to DSM-5 criteria. These include qualitative abnormalities in reciprocal social interaction, qualitative abnormalities in communication, and restricted, repetitive, and stereotyped patterns of behavior. The ADI-R systematically explores each domain through detailed questioning about specific behaviors, their frequency, and their developmental course.

The social interaction domain examines the individual's capacity for social-emotional reciprocity, nonverbal communicative behaviors used for social interaction, and ability to develop, maintain, and understand relationships. Questions probe early social development, including social smiling, social interest, and responsiveness to others, as well as more complex social behaviors such as friendship formation, empathy, and social imagination.

Within the communication domain, the ADI-R assesses both verbal and nonverbal communication abilities. For individuals with speech, the interview explores conversational abilities, pronoun use, stereotyped language, and social use of language. For those with limited verbal abilities, emphasis is placed on alternative communication methods and nonverbal social communication.

The restricted and repetitive behavior domain investigates unusual preoccupations, adherence to routines, stereotyped motor movements, and preoccupation with parts of objects. The interview also examines sensory sensitivities and unusual responses to environmental stimuli.

Additionally, the ADI-R includes questions about abnormalities of development evident at or before 36 months of age, which is crucial for establishing the early onset criterion required for autism diagnosis. This historical perspective is particularly valuable for adult diagnoses, where current presentation alone may not fully capture the developmental nature of the condition. The interview results in algorithm scores for each diagnostic domain. These scores can be compared to established diagnostic cutoffs, though clinical judgment remains essential in interpreting results within the broader assessment context.

For Mr. Fu's evaluation, the ADI-R provided essential developmental history that complemented direct observational data from the ADOS-2/BOSA and functional assessment information from the Vineland-3. The interview captured historical information about his early development, the emergence and persistence of autistic features, and the impact of these characteristics on his developmental trajectory. This historical context was integrated throughout other sections of this report to provide a comprehensive understanding of his presentation and support diagnostic formulation.

ADULT AUTISM SPECTRUM QUOTIENT (AQ)

The Adult Autism Spectrum Quotient (AQ) is a self-report screening instrument developed by Simon Baron-Cohen and colleagues at the Autism Research Centre, University of Cambridge, designed to measure autistic traits in adults aged 16 and older. Originally published in 2001, the AQ represents one of the most widely used and researched self-report measures for identifying autism spectrum characteristics in individuals with average or above-average intellectual functioning.

The questionnaire consists of 50 statements covering five key domains associated with autism spectrum conditions: social skills, attention switching, attention to detail, communication, and imagination. Each item presents a brief statement about behaviors, preferences, or experiences, which respondents rate using a four-point Likert scale ranging from "definitely agree" to "definitely disagree." The forced-choice format eliminates neutral responses, requiring individuals to commit to a position on each item.

The five subscales of the AQ correspond to theoretical constructs central to autism spectrum conditions. The social skills subscale examines comfort and competence in social situations, including items about enjoying social gatherings, finding conversation easy, and preferring social activities over solitary pursuits. The attention switching subscale assesses cognitive flexibility and the ability to shift focus between different tasks or topics, reflecting the executive functioning challenges often observed in autism. The attention to detail subscale captures the enhanced focus on local rather than global processing that characterizes autistic cognition, including tendencies to notice small details others miss and preferences for structured, detail-oriented activities.

The communication subscale explores both verbal and nonverbal aspects of social communication, including understanding of social context, use of language for social purposes, and interpretation of others' communicative intentions. Finally, the imagination subscale addresses social imagination and the ability to engage in creative, open-ended thinking, particularly in social contexts, rather than creative imagination in general.

Scoring of the AQ involves assigning one point for each response that indicates an autistic trait, with some items reverse-scored to control for response bias. Total scores can range from 0 to 50, with higher scores indicating more autistic characteristics. Research has established that adults diagnosed with autism spectrum conditions typically score significantly higher than neurotypical controls, with suggested cutoff scores around 32 for clinical populations, though these thresholds are intended for research rather than diagnostic purposes.

Importantly, the AQ was designed as a research instrument to quantify autistic traits in the general population and is not validated for diagnostic use. It serves as a screening tool that can inform clinical assessment but cannot independently establish or rule out an autism spectrum diagnosis. The measure's strength lies in its ability to capture the dimensional nature of autistic traits, recognizing that these characteristics exist on a continuum in the broader population rather than as discrete categories.

The questionnaire's self-report format provides valuable insight into an individual's subjective experience and self-perception regarding autism-related traits. However, this also represents a limitation, as individuals may have varying degrees of self-awareness about their behaviors and social difficulties. Some people may over-report difficulties due to anxiety or depression, while others may under-report due to limited insight or social desirability bias.

For Wei Fu's assessment, the AQ was administered during the November 22, 2024 meeting through conversational exploration of the questionnaire items rather than formal written completion. His responses provided valuable insight into his self-perception across the key domains measured by the instrument. His endorsements revealed significant difficulties in social situations, including challenges with reading social cues, maintaining conversations, and feeling comfortable in group settings. He expressed clear preferences for solitary activities over social gatherings and described difficulty understanding why others behave as they do.

Wei Fu's responses also indicated strong attention to detail, describing tendencies to focus intensely on specific aspects of tasks or interests while sometimes missing broader contextual information. His communication patterns reflected challenges with social use of language, including difficulty knowing when others might be bored or uninterested in his topics of conversation. He acknowledged problems with cognitive flexibility, finding it difficult to switch between different activities or adapt when routines are disrupted.

The AQ results contributed to the overall assessment profile by providing Wei Fu's perspective on his own autism-related traits and experiences. While not diagnostic in isolation, his responses were consistent with the pattern of difficulties observed through direct assessment with the ADOS-2/BOSA, developmental history gathered through the ADI-R, and functional impairments documented in the Vineland-3. This convergence across multiple assessment methods and

informant perspectives strengthened the overall clinical picture and supported diagnostic formulation.

**POST-TRAUMATIC STRESS DISORDER (PTSD) ASSESSMENT**

Post-Traumatic Stress Disorder (PTSD) is diagnosed when an individual meets specific criteria outlined in the DSM-5 following exposure to actual or threatened death, serious injury, or sexual violence. The diagnosis requires evidence across multiple symptom clusters that persist for more than one month and cause clinically significant distress or impairment in functioning.

Criterion A, Exposure to Traumatic Event: Wei Fu clearly meets Criterion A through direct exposure to a traumatic event. On September 26, 2012, during his first year in the United States, he was the victim of a violent assault and robbery that involved being beaten and kicked, including blows to his head and right eye. The severity of this attack is evidenced by the resulting detached retina requiring surgical intervention and permanent vision loss. Documentation from Stevens Institute of Technology Police confirms he was the victim of a strong-armed robbery with continuous assault, and this incident was further documented in U Nonimmigrant Status Certification forms and police reports identifying him as a victim of felonious assault and robbery. The traumatic nature of this event, involving actual serious injury and threat to physical safety, clearly satisfies the exposure criterion.

Criterion B, Intrusion Symptoms: Wei Fu demonstrates multiple intrusion symptoms consistent with PTSD. Dr. Nathan Kadan's psychiatric evaluations documented recurrent trauma-related nightmares, flashbacks, and intrusive thoughts related to the 2012 assault. Wei Fu himself reported experiencing nightmares about the event and described being "scared all the time" afterward. The effectiveness of Prazosin, a medication specifically prescribed for trauma-related nightmares, in reducing his night terrors provides additional clinical evidence of trauma-related intrusive symptoms. Psychological testing further supports this criterion, with the MMPI-3 indicating intrusive ideation and nightmares, and the MCMI-IV noting persistent distressing recollections and recurring nightmares or flashbacks.

Criterion C, Avoidance Symptoms: Clinical documentation reveals significant avoidance behaviors consistent with this criterion. Dr. Kadan noted that Wei Fu engaged in avoidant behavior to prevent exposure to trauma reminders and actively avoided places and situations that might trigger traumatic memories. The psychiatric assessment documented his efforts to avoid thoughts and feelings associated with the traumatic event. This pattern of persistent avoidance of trauma-related stimuli, including both external reminders and internal experiences, meets the DSM-5 requirements for this symptom cluster.

Criterion D, Negative Alterations in Cognition and Mood: Several symptoms in this domain are documented in Wei Fu's clinical presentation. Dr. Kadan's assessments noted anhedonia (diminished interest in activities), restricted affect, and emotional detachment. The Vineland-3 assessment identified maladaptive behaviors including lacking interest in activities and feeling helpless, which align with negative mood states and diminished interest characteristic of PTSD. These persistent negative emotional states and cognitive changes represent significant alterations from his pre-trauma functioning.

Criterion E, Alterations in Arousal and Reactivity: Wei Fu demonstrates multiple symptoms within this criterion cluster. Clinical documentation reveals chronic hypervigilance, with Dr. Kadan noting that he never feels safe and maintains a constant state of heightened alertness. He exhibits an exaggerated startle response, being easily startled by environmental stimuli. Sleep difficulties are extensively documented, including both the nightmares discussed under intrusion symptoms and general sleep disturbances. Irritability and concentration problems are noted in both psychiatric evaluations and psychological testing. Additionally, he shows physiologic reactivity when re-exposed to trauma reminders, completing the picture of dysregulated arousal and reactivity.

Criterion F, Duration: The duration criterion is clearly met, as symptoms have persisted for over a decade since the 2012 traumatic event. Dr. Kadan's 2024 evaluations noted that symptoms had affected Wei Fu for more than a year prior to assessment, and the chronic nature of his PTSD diagnosis indicates long-standing symptomatology well beyond the required one-month minimum.

Criterion G, Functional Impairment: The clinical evidence demonstrates significant impairment in multiple life domains. Wei Fu's ongoing need for psychiatric treatment, medication management for trauma symptoms, and the documented impact on his emotional regulation and daily functioning indicate clinically significant distress and impairment. The chronic nature of his presentation and need for specialized trauma treatment further support the presence of functional impairment.

Criterion H, Exclusion of Substance Use: Available clinical documentation does not indicate that symptoms are attributable to substance use or another medical condition, though this should be systematically evaluated in comprehensive assessment.

*Clinical Consensus and Professional Diagnoses:* Multiple qualified professionals have independently diagnosed Wei Fu with PTSD, including Dr. Nathan Kadan (psychiatrist), Dr. Thomas Haworth (forensic psychologist), and Lucien Thomsen, LCSW (therapist). Psychological testing instruments, including the MCMI-IV and MMPI-3, provided convergent evidence supporting PTSD diagnosis. This professional consensus, combined with documented symptomatology across all required criterion domains, provides strong support for the PTSD diagnosis.

*Clinical Summary:* Wei Fu meets full DSM-5 criteria for Post-Traumatic Stress Disorder, chronic, with clear evidence across all required symptom clusters. The diagnosis is well-supported by multiple professional evaluations, psychological testing, documented functional impairment, and appropriate treatment response to trauma-specific interventions. The chronic nature of his presentation and the severity of the original traumatic event provide a compelling clinical picture consistent with PTSD diagnosis.

**OBSESSIVE COMPULSIVE DISORDER / HOARDING DISORDER**

Dr. Haworth, a forensic psychologist, described Mr. Fu's presentation as showing significant indicators for Obsessive-Compulsive Disorder (OCD), specifically referring to it as a "kind of

OC hoarder" thing. Dr. Haworth's observations supporting this impression included Mr. Fu's purchasing and buying habits, where he noted hundreds of guns and ammunition that were never taken out of their packaging, as well as exercise equipment that was never out of the pack. Video evidence of Mr. Fu's house was described as being "loaded" with stuff just stacked up all over the place, leading Dr. Haworth to characterize Mr. Fu as "collecting collecting collecting collecting". Additionally, the footage depicted extremely unsanitary, disorganized living conditions.

This tendency to collect was also hypothesized by Dr. Haworth to extend to Mr. Fu's online behavior, suggesting that his exploration of pornography involved going down "rabbit holes" to find more and "collect because it's kind of what he does". Dr. Haworth referred to this digital accumulation as part of a "compulsion to collect". Mr. Fu himself stated to SA Fallon that he "just likes to collect stuff" when asked about keeping a large collection of CSAM.

Dr. Haworth also linked this tendency to the concept of schizoid personality style, noting that the "almost mildly paranoid hoarding of defense items and things along those lines" resonated with that idea. While the MMPI-3 report suggested evaluating for features of personality disorders involving detachment such as Schizoid and features of personality disorders involving negative emotionality such as Dependent and Obsessive-Compulsive, and the MCMI-IV report suggested Avoidant Personality Type and Schizoid Personality Style as possible personality disorder classifications along with Obsessive-Compulsive and Dependent features, the specific mention of hoarding in connection with these traits was primarily from Dr. Haworth's observations and impressions. The MMPI-3 report indicated that Mr. Fu reported engaging in compulsive behavior, including repetitive checking and counting, and making sure things were in place, and that he was very likely rigid and perfectionistic. Mr. Fu also reported obsessiveness or compulsiveness related to hand washing to Dr. Kadan. These details, while not explicitly using the term "hoarding," aligned with some characteristics associated with obsessive-compulsive tendencies mentioned in the context of hoarding by Dr. Haworth.

**OTHER DIAGNOSTIC CONSIDERATIONS**

Based on the sources and our conversation history, there was relevant information regarding the diagnostic considerations of depression, anxiety, and schizoid personality disorder in the context of whether their symptoms might be better accounted for by an Autism Spectrum Disorder (ASD).

Wei Fu reported experiencing depression and anxiety. He stated that prior to his current legal issues, he never considered mental health issues because there was essentially no such concept in his cultural background. He mentioned starting mental health treatment after the "issue" or "problem" arose. He was diagnosed with depression and anxiety. Dr. Nathan Kadan diagnosed him with Major depressive disorder, single episode, severe without psychotic features (F32.2) and Generalized Anxiety Disorder (F41.1), starting in August 2024. Wei Fu reported endorsing feelings of hopelessness, sadness, irritability, and a lack of interest and motivation in recreational activities to Dr. Kadan in August 2024. Follow-up notes detailed continued struggles with symptoms of depression and anxiety, including fatigue, difficulty concentrating, irritability, poor appetite, and excessive daytime sleeping to escape feelings. He reported only modest

improvement with medication by late October 2024. A report from Mr. Thomson noted that Mr. Fu reported current symptoms of depression and social anxiety and was developing treatment goals addressing depression and social anxiety symptoms. The PAI, completed as part of the assessment with Mr. Thomson, suggested DSM-5 diagnostic possibilities including Major depressive disorder, single episode, unspecified and social anxiety.

The MCMI-IV interpretive report suggested potential diagnoses including Major Depression (recurrent, severe) and Generalized Anxiety Disorder. It noted that his presentation was highly suggestive of a major depressive disorder, riddled with feelings of inadequacy and hopelessness. The report also indicated that Mr. Fu was suffering from a prominent generalized anxiety disorder, with symptoms including behavioral edginess, apprehensiveness over trivial matters, pervasive social disquiet, and worrisome self-doubts, consistent with his overall personality makeup. The MMPI-3 interpretive report also indicated significant demoralization, lack of positive emotions, helplessness and hopelessness, self-doubt, perceived inefficacy, negative emotionality, stress, worry, anxiety, fears, and compulsivity. It suggested evaluation for anxiety-related disorders, including generalized anxiety disorder, and major depression and other anhedonia-related disorders.

Regarding personality, the MCMI-IV interpretive report suggested that Wei Fu appeared to fit the personality disorder classifications of Unspecified Personality Disorder (Melancholic) Disorder, and Dependent Personality Disorder, with Avoidant Personality Type, and Schizoid Personality Style. It described his personality traits as enduring and pervasive, underlying emotional, cognitive, and interpersonal difficulties, rather than largely transitory symptoms. The Schizoid Personality Style was characterized by being Interpersonally Unengaged, having Meager Content, and being Temperamentally Apathetic. The report noted his gloomy moodiness and self-protective withdrawal. The MMPI-3 suggested evaluation for features of personality disorders involving detachment such as Schizoid and disorders involving lack of interest in close relationships. It noted that he reported disliking people and being around others, preferring to be alone, and was very likely asocial. He also reported not enjoying social events and avoiding social situations, and was likely socially introverted, struggled with forming close relationships, and was emotionally restricted.

Sources discussed the overlap and potential connection between ASD and conditions like depression, anxiety, and schizoid personality disorder. Autism Spectrum Disorder was generally associated with social communication challenges, and similar difficulties were seen in schizoid personality disorder. Social difficulties in ASD could also contribute to social withdrawal seen in depression and GAD. Restricted and repetitive behaviors often seen in autism could resemble certain anxiety-driven habits. Difficulties managing emotions were common across these conditions, with autism linked to challenges in understanding and expressing feelings.

One source suggested that rather than viewing these as discrete diagnoses, they could be seen as part of a neurodevelopmental continuum. In this framework, depression and GAD might be viewed as secondary reactions or comorbidities resulting from longstanding social and emotional difficulties associated with autism. A unifying framework could focus on core neurocognitive styles like social cognition deficits, sensory sensitivities, and executive function differences. Developmental trajectories could help explain why depression and anxiety often co-occurred

with autism, as coping mechanisms and social challenges accumulated over time. It was noted that while there were overlaps, each condition possessed distinct features, and diagnostic consolidation should be approached cautiously; however, the autism framework could help explain some social and emotional features.

The Vineland-3 results indicated significant weaknesses across multiple adaptive behavior domains (see above). These difficulties in social, communication, and daily living skills, along with certain maladaptive behaviors, were consistent with challenges observed in individuals with ASD. Inconsistencies in function are a hallmark of Autism Spectrum Disorder and other neurodevelopmental conditions. Social skills being at a childlike level, may have compromised Mr. Fu's emotional understanding (cognitive empathy), causing others to distance themselves and contribute to his social peculiarities.

In summary, while Wei Fu received diagnoses for depression and anxiety and the MCMI-IV suggested a schizoid personality style, and there is an open question of OCD, it is my clinical opinon that symptoms shared by these conditions, particularly social difficulties, emotional regulation issues, and patterns of restricted interests or behaviors, are also core features of Autism Spectrum Disorder and are more simply represented by this condition. Depression and anxiety may have developed as secondary issues or comorbidities to the challenges of navigating social interactions given his underlying neurodevelopmental differences coupled with various stressors. Dr. Haworth considered the possibility of autism and schizoid traits, noting that cultural factors could influence the presentation and that while there was some observed reciprocity in communication, isolation and limited social connections could align with either schizoid or autism. The Vineland-3 results indicating significant functional impairments across communication, socialization, and daily living domains also provided data that could be considered within a neurodevelopmental framework. Therefore, while depression, anxiety, OCD and schizoid traits are diagnostic considerations, the information suggested that many of Wei Fu's symptoms and behaviors could potentially be better understood as manifestations of an underlying Autism Spectrum Disorder.

**MALINGERING**

Throughout the examination multiple nuanced idiosyncrasies were part of Mr. Fu's presentation and history. In my judgment, his presentation was authentic and valid. I also administered the M-FAST (Miller Forensic Assessment of Symptoms Test), a formal screening instrument designed to detect potential malingering of psychiatric symptoms. The M-FAST is a 25-item structured interview that assesses seven validity strategies commonly employed by individuals who malinger psychological symptoms, including reported versus observed symptoms, extreme symptomatology, rare combinations of symptoms, unusual hallucinations, unusual symptom course, negative image, and suggestibility.

His M-FAST performance yielded a total score that was mildly elevated above the recommended cutoff, but the pattern of responses was more consistent with genuine symptom over-endorsement rather than deliberate misrepresentation or fabrication of a mental health condition. Specifically, his elevations appeared to reflect authentic distress and a tendency to amplify legitimate symptoms rather than the fabrication of improbable or bizarre symptomatology

typically seen in malingering presentations. The M-FAST's ability to distinguish between over-reporting due to genuine distress versus intentional deception was particularly valuable in this case.

The MCMI-IV report by Dr. Haworth suggested a characterological inclination to complain or to be self-pitying, or feelings of extreme vulnerability associated with a current episode of acute turmoil, which might lead to an over-reporting of symptoms. This personality-based tendency toward symptom amplification aligns with the M-FAST findings and provides context for understanding his test performance within the framework of authentic psychological distress rather than malingering.

Additionally, Mr. Fu's focus on short-term disability benefits and his failure to disclose information about his legal case to Dr. Zaman raised legitimate concerns that external incentives might be influencing his symptom presentation. These factors warranted careful consideration alongside the M-FAST results, as the presence of secondary gain does not automatically indicate malingering but does require thorough evaluation.

Overall, it was my impression that Mr. Fu was not malingering or deliberately misrepresenting his psychological condition, even while he demonstrated a pattern of over-endorsing symptoms. The convergence of evidence from clinical observation, the M-FAST screening, personality assessment findings, and contextual factors supported a conclusion of genuine psychological distress with symptom amplification rather than intentional deception or malingering.

**CULTURAL CONSIDERATIONS**

Mr. Fu's cultural background, specifically his upbringing in China and subsequent immigration to North America, introduced significant complexity to his psychological assessment that warrants careful consideration throughout the evaluation process. Dr. Haworth noted that Mr. Fu's presentation was "somewhat confounded by cultural components," highlighting the intricate challenge of disentangling culturally normative behaviors from potential psychopathology, particularly when evaluating neurodevelopmental conditions like Autism Spectrum Disorder.

The intersection of culture and potential ASD diagnosis presented particular diagnostic challenges. Social communication patterns, eye contact preferences, collectivist versus individualist orientations, and expressions of emotional distress can vary substantially across cultures, potentially masking or mimicking symptoms associated with autism spectrum conditions. When considering Wei Fu's social interactions, including his apparent lack of a solid peer group or romantic relationships, Dr. Haworth appropriately questioned "how much of that was cultural, how much of that was him being different." This clinical inquiry reflected the sophisticated diagnostic reasoning required when cultural factors may influence the presentation of core ASD symptoms, particularly in areas of social reciprocity and relationship formation.

However, Dr. Haworth's comparative analysis provided important contextual anchoring for this assessment. Drawing from his extensive clinical experience, he noted that he had evaluated "a lot of international students" and observed that "usually they find their peer group," suggesting that successful social integration within cultural communities is typically achievable for individuals

navigating cross-cultural transitions. This clinical comparison offered a valuable reference point, indicating that while cultural adaptation challenges are expected and normative, Mr. Fu's degree of social isolation appeared to exceed what might be anticipated solely from cultural adjustment difficulties.

This nuanced cultural formulation has direct implications for diagnostic accuracy and treatment planning. Rather than attributing Mr. Fu's social difficulties entirely to cultural factors or dismissing them as pathological without cultural context, the assessment required a sophisticated understanding of how genuine neurodevelopmental differences might manifest within his specific cultural framework. The evaluation process needs to account for cultural variables while remaining sensitive to underlying neuropsychological patterns that transcend cultural boundaries, ensuring that neither cultural bias nor cultural over-attribution influence the diagnostic conclusions.

**MENTAL STATUS EXAMINATION**

Below is a detailed mental status exam of Mr. Wei Fu, drawing on information gathered across multiple sessions and assessments.

**Appearance:** Mr. Wei Fu is a 38-year-old Chinese-born male. He possesses a normal body habitus and appears his stated age. His appearance is neat, with no abnormalities. During sessions conducted via Zoom, he was able to adjust the camera view as requested.

**Behavior and Psychomotor Activity:** Mr. Fu was consistently engaged, pleasant, and cooperative during interviews and meetings. He showed no overt psychomotor impairment.

**Attitude towards Examiner:** Mr. Fu was consistently cooperative and polite across sessions. He expressed gratitude. He sought clarification regarding confidentiality and other matters. He agreed to requests, such as discussing the firearms, clarifying information later, and following up by phone.

**Speech:** Mr. Fu was fluent in English. His tone, volume, and articulation were developmentally appropriate, with a normal rate and rhythm. The Vineland-3, based on parental report, noted his Expressive language skills were low compared to norms, with difficulty using pronouns correctly as a child in English. The Vineland-3 reported he usually modulated his speech to fit the conversation and usually talked with others without interrupting, but sometimes struggled to stay on topic. He experienced difficulty knowing when it was his turn to speak on the phone, based on an AQ item response. He may have used "strange or repetitive speech," which was endorsed as occurring "Often" on the Vineland-3.

**Mood:** Mr. Fu's reported mood varied, sometimes stating he was "good". However, clinically, his mood was frequently described as anxious and depressed. He reported significant feelings of sadness, hopelessness, irritability, worry, and fear. The MCMI-IV report noted a mournful, joyless, tearful, and morose emotional disposition, intensified by worrisome, pessimistic, and guilt-ridden tendencies, describing him as often forlorn and experiencing pervasive sadness. He

felt lonely and empty most of the time and very unhappy with who he was. He reported experiencing considerable and pervasive emotional distress.

**Affect:** Consistent with his reported mood, his affect was observed as restricted in range and intensity. The MCMI-IV described temperamentally-based apathy and sadness undermining his capacity to enjoy life. The MMPI-3 noted low positive emotions, anhedonia, and pessimism. Parental report on the Vineland-3 indicated that, as a child, he rarely showed different emotions, looked at faces, or smiled in response to smiles.

**Thought Process:** His thought process was generally intact, linear, and goal-oriented during clinical interviews, without internal distractions noted. The MCMI-IV described brooding over past events, preoccupation with self-pity, and feelings of being misunderstood and mistreated. The MMPI-3 indicated he worried excessively and ruminated. He reported engaging in compulsive behavior, rigid, and perfectionistic tendencies. An endorsed AQ item noted he frequently got so strongly absorbed in one thing that he lost sight of all other things. Endorsement of "Gets so fixated on a topic that it annoys others" (Often) and "Excessive interest in or references to unusual or highly specific topics or objects or repetitive behaviors" (Often) on the Vineland-3 pointed to intense/restricted interests. Inflexible thinking and cognitive rigidity were noted as prominent traits in the context of potential Autism Spectrum Disorder.

**Thought Content:** Mr. Fu denied current suicidal ideation, homicidal ideation, and auditory/visual hallucinations in his interviews with me. It as my assessment that he is not an immediate risk for suicidal or homicidal behavior. However, the MCMI-IV report noted thoughts of suicide, and the MMPI-3 report indicated a high risk for suicidal ideation based on scale scores. He reported intrusive thoughts, nightmares, and flashbacks related to the trauma he experienced. He reported a preoccupation with handwashing and endorsed compulsive behavior items. The MMPI-3 indicated worries about misfortune, finances, and disappointments, and reported multiple fears that significantly restricted his activity. He denied delusions, grandiosity, or paranoia in clinical interviews. He possessed fixations on topics and objects.

**Perception:** In clinical interviews, Mr. Fu denied hallucinations or delusions, and no evidence of psychotic symptoms was noted. However, the Vineland-3, based on parental report, included an endorsement of "Hears voices or sees things that others do not" (Often). The MCMI-IV noted an endorsed item indicating he "very often hear things so well that it bothers me", which may have related to sensory sensitivities rather than hallucinations.

**Cognition:** Mr. Fu was alert, attentive, and oriented to person, place, date, and situation. His short and long-term memory appeared intact in interviews. He was aware of current events and demonstrated a good fund of knowledge. Despite high intellect, he reported significant impaired concentration, noting difficulty keeping his mind on tasks, paying attention, understanding reading, focusing, and memory problems on the MMPI-3. He felt indecisive and inefficacious, struggling with decision-making and dealing with matters. His Vineland-3 scores for Communication (especially Receptive and Expressive) were very low compared to peers. Problem-solving and foreseeing possible outcomes were described as often poorly developed in individuals with Autism Spectrum Disorder, despite adequate intellect.

**Insight:** His insight was described as fair or appearing normal within the context of the evaluation. He was aware of current events. He acknowledged his legal issues and noted modest improvement with medication. He understood the limits of confidentiality and reflected on past social missteps and their potential negative impact. He was aware that his current psychiatrist was not aware of his legal case and preferred not to disclose it, feeling that the scope of that provider's practice was limited to depression and anxiety treatment. Despite academic ability, his social understanding and insight into social situations and relationships were limited.

**Judgment:** His judgment fair. It is not clear to me that keeping the information about his legal situation from his current psychiatrist was a good idea. And there are other indications that he lacks judgment, including switching counsel multiple times. The MCMI-IV described a lack of mature confidence, inclination to subordinate his wishes, abdicate responsibility, and behave in a helpless/inadequate manner, as well as being indecisive and inefficacious. The MMPI-3 reported he described himself as passive and submissive, not liking to be in charge, and ready to give in to others, which aligned with the MCMI-IV findings and suggested difficulties in autonomous decision-making. The MMPI-3 also suggested he was possibly overly trusting, and theoretical information on ASD suggested problem-solving ineptitude could lead to socially risky or unwise decisions due to difficulties foreseeing consequences.

**SUMMARY**

Mr. Fu met the diagnostic criteria for Autism Spectrum Disorder (ASD) based on comprehensive evaluation including history review, psychiatric testing, interviews with him, his providers and family, and standardized assessments (BOSA/ADOS, Vineland-3, AQ, ADI-R). The diagnosis was substantiated as fundamentally authentic through clinical observations and considerations of potential malingering. ASD is a neurodevelopmental condition with two defining features: persistent deficits in social communication and social interaction across multiple contexts, and restricted, repetitive patterns of behavior, interests, or activities. While Mr. Fu possesses high intellectual abilities, high intellect does not negate the presence of significant functional difficulties, as inconsistent functioning across different domains is characteristic of ASD.

Mr. Fu's lifelong pattern includes significant social and interpersonal challenges marked by a solitary nature with few friendships, social anxiety, difficulty forming close relationships, limited emotional expression, poor eye contact, minimal response to social cues, difficulty recognizing emotions in others, and delayed language development. His scores on the Vineland-3 confirmed extremely low adaptive functioning in the Socialization domain, specifically in Interpersonal Relationships, Play and Leisure, and Coping Skills. These social learning deficits meant he may not have known basic social conventions and mores that others take for granted, and missing many social experiences resulted in delayed social development, leaving him with social maturity more akin to a child or young teen. This lack of typical social learning, including understanding social cues like age of consent or norms regarding age differentials, could mean he was unaware of social and legal taboos that neurotypical individuals learn easily. His impaired Theory of Mind may have led him to struggle understanding what others were thinking or feeling, potentially contributing to difficulty understanding the harm involved in creating CSAM.

Mr. Fu also exhibited restricted and repetitive behaviors including compulsive handwashing, intense focus on specific topics through deep dives, inflexible thinking patterns, rigid perfectionism, resistance to routine changes, and poor problem-solving skills. This prominent cognitive rigidity included struggling with shifting perspective and understanding others' viewpoints, which directly led to his exploration of the Dark Web. This intense focus on a specific topic, described as monotropism or deep singular focus, is characteristic of Autism. His rigid thinking about his special interest topic, combined with limited social experience and poor social foresight skills, caused him to proceed without fully grasping the dangers or foreseeing that encountering such material could lead to a federal investigation.

Difficulties with problem-solving and foreseeing possible outcomes of behavior are common in ASD, and limited social experiences meant fewer opportunities to learn the social results of different behaviors, impacting social foresight and resulting in socially problematic and unwise decisions, particularly in online environments. Mr. Fu's developmental history revealed frequent nightmares, fine motor difficulties, irritability, sleep problems, fascination with certain objects, and challenges with daily living skills like eating neatly and dressing. Family history included relatives with similar traits including a reclusive paternal grandfather who didn't speak to others, and cousins with learning and communication difficulties. These patterns across social interaction, communication, behavior, interests, thinking style, and development, along with family history, provided comprehensive evidence for the ASD diagnosis.

In my opinion, there is a direct and substantial connection between Mr. Fu’s Autism Spectrum Disorder and the conduct that led to the present charges. His autistic traits, including profound social-communication deficits, childlike social maturity despite intact intellect, intense and narrow special interests, and rigid, detail-focused thinking, significantly impaired his ability to understand the social and legal meaning of the material he was downloading and collecting. Instead of approaching online sexual material with the perspective and judgment of a typical adult, he approached it in a highly literal, rule-based way, focusing on acquiring and organizing large quantities of files as part of an obsessive collecting pattern, without adequately appreciating the human harm reflected in those images.

The same neurodevelopmental vulnerabilities that have affected him for his entire life, difficulty recognizing others’ perspectives and emotions, limited understanding of unwritten social rules, problems foreseeing the consequences of his behavior, and a longstanding tendency to retreat into solitary, technology-based interests, all converged in the online environment and made him unusually susceptible to engaging in this offending behavior via digital collecting, rather than through an antisocial or predatory sexual motivation.

The impact of Mr. Fu's ASD was significantly compounded by trauma and isolation. In 2012, he was the victim of an assault and robbery, resulting in PTSD with debilitating symptoms including recurrent trauma-related nightmares, flashbacks, intrusive thoughts, chronic hypervigilance, persistent feelings of being unsafe, and avoidant behaviors. These symptoms significantly impacted his daily life, causing depression, anxiety, sleep and concentration difficulties, and heightened irritability, further isolating him and leading to paranoia about his safety and weapon accumulation. As a Chinese-born individual residing in the US, Mr. Fu faced additional isolation layers, as since the 2012 incident, he could not return to China due to eye

surgery, the COVID-19 pandemic, and U visa program requirements that mandated remaining in the US to assist police investigations. This decade-long physical separation from his original cultural environment and family, his only source of support, created geographic isolation that, combined with ASD social difficulties and trauma effects, created a layered sense of disconnect and loneliness that compounded his overall experience of isolation.

From a clinical perspective, several features of Autism Spectrum Disorder can meaningfully reduce moral culpability, even when an autistic individual is legally responsible for his actions. Autistic adults may have marked delays in social learning and social maturity, such that they have not internalized, at an adult level, the unwritten social and moral rules that most neurotypical adults absorb incidentally. Difficulties with Theory of Mind (understanding others' perspectives and emotional states), concrete and literal thinking, and a tendency to focus on details rather than the broader social meaning of a situation can all interfere with appreciating the full human impact of one's behavior, particularly in abstract, technology-mediated contexts such as the internet.

In addition, many autistic individuals rely heavily on rules and external structure rather than intuitive moral reasoning. When rules are complex, inconsistently enforced, or poorly explained, they may follow idiosyncratic internal rules (for example, distinguishing between 'looking' and 'hurting' or between 'collecting' and 'actively participating') that diverge from the law's and society's understanding of the same conduct. These neurodevelopmental limitations do not excuse criminal behavior but do mean that, in general, autistic defendants often have a diminished capacity to appreciate risk, foresee consequences, and grasp the depth of wrongfulness in the same way as a typical adult.

In Mr. Fu's case, the assessment shows precisely this pattern. He has very low adaptive socialization scores, with social functioning and judgment more consistent with a child or young adolescent despite high measured intellect, and lifelong difficulty understanding social cues, age-related norms, and the emotional experiences of others. His history and testing demonstrate pronounced cognitive rigidity, intense collecting behavior, and immersion in solitary, computer-based interests, all of which made him especially vulnerable to engaging with online material without fully grasping its legal and moral implications.

Taken together, these autism-related deficits in social understanding, emotional perspective-taking, and social maturity meaningfully diminished the degree to which Mr. Fu's behavior reflected the kind of informed, freely chosen moral decision-making that typically underlies full adult culpability, even though he accepts responsibility and meets the legal criteria for guilt.

**RECOMMENDATIONS**

Given the relationship between Mr. Fu's mental state and his criminal actions, interventions must focus on treatment rather than solely punitive measures. Primary interventions should address his social learning disorder, including his undeveloped and immature social skills, difficulty understanding social conventions and mores that others took for granted, impaired ability to interpret social cues and the entire social scene, and difficulty recognizing emotions and perspectives in others. Explicit teaching of these social skills and understanding of social rules, particularly legal and social taboos including those related to age of consent and age

differentials, is crucial, as his limited social experiences meant he missed opportunities to learn these norms. Addressing his inflexible thinking is also vital, as this contributed to difficulty shifting perspective and was linked to his intense, singular focus that led to his exploring and collecting CSAM. Developing cognitive flexibility and the ability to adjust behavior and thinking in response to a changing environment is a necessary target.

Furthermore, interventions should target his impaired problem-solving and foreseeing abilities, particularly his difficulty imagining consequences of behavior, understanding the intentions behind actions, and making socially appropriate decisions. Improving these executive functions and mentalizing skills is essential for him to understand the potential negative outcomes of his actions. Addressing the specific alleged criminal behavior also necessitates engaging in sex offense specific treatment, with goals including accepting responsibility, understanding sexual behaviors and victim impact, and developing relapse prevention strategies. Concurrently, addressing co-occurring mental health conditions such as depression, anxiety, PTSD, and compulsive behavior like handwashing is important for his overall well-being and ability to engage in treatment through psychotherapy and potentially medication. This comprehensive approach recognizes that Mr. Fu's criminal behavior emerged from the complex interplay of his neurodevelopmental condition, traumatic experiences, and profound isolation, requiring interventions that address these underlying factors rather than focusing solely on punishment.

**VULNERABILITY IN PRISON**

In *United States v. Knott*, 638 F. Supp. 3d 1310, 1316 (M.D. Ala. 2022) the court found that a defendant's ASD made him "extraordinarily vulnerable to abuse in prison." This concern was highlighted by an extensive literature. Some examples are included in the bibliography in Appendix 2. As an autistic individual, Mr. Fu might face a number of challenges in the prison environment. Autistic people like Mr. Fu may struggle to interpret subtle social cues, nonverbal communication, and the nuances of social interactions. This could lead to misunderstandings, misinterpretations of others' intentions, and difficulty forming appropriate relationships. These social and communication challenges could make autistic individuals more susceptible to manipulation, exploitation, and bullying by other inmates. An autistic individual, like Mr. Fu, may misinterpret aggression or threats as friendship, fail to recognize dangerous situations or be unable to effectively defend themselves. Autistic individuals are more likely to be placed in isolation or segregation than the typical inmate. While often intended to be protective, this could further exacerbate social isolation, limit access to rehabilitative programs, and potentially lead to longer periods of incarceration.

The unique behaviors associated with ASD, such as limited eye contact, repetitive movements, or difficulty expressing emotions, could be misconstrued by prison staff as noncompliance, disrespect, or even guilt. This could lead to unfair, disproportionate and unmerited disciplinary action or negative perceptions that hindered their progress within the system. As a result of ASD, Mr. Fu possessed a strong need for routine and predictability and, at times, could become distressed when these routines were disrupted. The unpredictable and often chaotic nature of prison life, with its shifting schedules and power dynamics, could be extremely stressful and difficult to adapt to. Additionally, autistic people may possess heightened sensory sensitivities to noise, light, touch, or other stimuli. The overstimulating environment of a prison, with its

constant noise, crowds, and lack of personal space, could be overwhelming and could lead to sensory overload or meltdowns. Prisons are rarely equipped to understand and support autistic people. Often, there is a lack of adequate training and awareness about ASD among prison staff, which could lead to misinterpretations of behavior, inadequate support for individuals' needs, and missed opportunities for intervention. Rehabilitation programs within prisons are often not designed to accommodate the unique learning styles and communication needs of autistic individuals. This could limit their ability to benefit from these programs and hinder their chances of successful reintegration into society.

**RISK OF RECIDIVISM**

Based on my assessment of Mr. Fu, I can provide an informed opinion regarding his recidivism risk for both re-offending using the internet, and progression to contact offenses. The empirical literature consistently demonstrates that individuals charged with CSAM possession/distribution offenses have remarkably low recidivism rates. Research shows that only 3% of CSAM offenders commit a new contact sexual offense against a child within 5 years, and 9% commit a new CSAM offense (Seto & Eke, 2015). Meta-analyses indicate that approximately 4.6% of internet offenders commit any new sexual offense during follow-up periods, with only 2% committing contact sexual offenses and 3.4% committing new CSAM offenses (Seto, Hanson & Babchishin, 2011). Mr. Fu's risk profile places him at the lower end of even these already low base rates due to several key protective factors, including his complete absence of prior criminal history, no history of contact sexual offenses, higher education level with a Master's degree, and notably, his lack of antisocial personality traits. Dr. Haworth specifically observed that he doesn't have "an antisocial bone in his body" and noted his tendency to actively avoid places with children despite living in a neighborhood with them.

The research literature also describes the rarity of progression from online-only to contact offenses. Studies show that the five-year contact recidivism rate was 2.2% for online offenders compared to 7.5% for mixed offenders. Even with longer follow-up periods, these recidivism rates are lower than those observed in offline sex offenders and contradict the idea that all internet offenders pose high risk for contact offenses (Seto, Hanson & Babchishin, 2011). For Mr. Fu specifically, several factors make progression to contact offenses highly unlikely, particularly his autism spectrum disorder which appears to function as a protective rather than risk factor. His profound social communication deficits, preference for solitary activities, extreme discomfort in social situations, and active avoidance of interpersonal contact all serve to minimize any risk of contact offending. Research indicates that individuals with ASD may view CSAM as a way to understand relationships and sexuality rather than as a precursor to sexual offending behavior toward minors (Allely and Dubin, 2024). Additionally, his social maturity level has been described as "childlike" despite normal intelligence, and clinical observations reveal that his collecting behavior appeared driven by obsessive-compulsive tendencies rather than sexual deviance.

Public perceptions dramatically overestimate recidivism rates, with the public estimating 72% recidivism when actual rates range from 1.6% to 7% (Steel et al., 2022). Research consistently shows that recidivism rates for CSAM-only offenders are lower than for other sex offenders, with studies finding less than 10% recidivism for both new contact and new CSAM offenses

(Steel et al., 2024). The CSAM Offender Risk Tool (CPORT) research validates these low rates, with the development study showing that among 266 adult male CSAM offenders followed for 5 years, only 3% committed a new contact sexual offense against a child (Seto & Eke, 2015).

Regarding autism spectrum disorder specifically, large-scale studies of adults with ASD show that rates of criminal justice system contact are not higher than clinical comparison groups (Blackmore et al., 2022). Research emphasizes that individuals with ASD are no more likely to engage in violent offending behavior when compared to the general population, with some studies indicating they may actually be less likely to engage in offending behavior (Allely and Dubin, 2024). The evaluation clearly documents that Mr. Fu's offending behavior was well-explained by his autism-related deficits in social understanding, rigid thinking patterns, and poor insight into consequences rather than by sexual deviance or antisocial tendencies.

Mr. Wei Fu presents as a low risk for both sexual recidivism and progression to contact offenses. His risk profile is characterized by multiple protective factors and an absence of validated risk factors. His autism spectrum disorder, rather than increasing risk, appears to contribute to social avoidance patterns that would further decrease the likelihood of contact offending. The literature strongly supports that individuals like Mr. Fu, who are first-time offenders with no contact offense history, higher education, and significant social deficits, represent the lowest risk category within an already low-risk population. His case exemplifies why experts emphasize the need for diversion programs and mental health courts for individuals with ASD charged with CSAM offenses, as they require intervention and support rather than purely punitive approaches.

In summary, in Mr. Fu's case, I am confident that with the right support he is at very low risk for recidivism, and that punishment and rehabilitation would be best achieved outside of an institutional environment because of his particular vulnerabilities attributable to autism.

Yours sincerely,



Alexander Westphal, M.D., Ph.D.
Associate Professor, Adjunct, Division of Law and Psychiatry
Yale University School of Medicine

**APPENDIX 1**

**DSM-5 Criteria for Autism Spectrum Disorder**

A. Persistent deficits in social communication and social interaction across multiple contexts, as manifested by the following, currently or by history:

1. Deficits in social-emotional reciprocity, ranging, for example, from abnormal social approach and failure of normal back-and-forth conversation to reduced sharing of interests, emotions, or affect to failure to initiate or respond to social interactions.
2. Deficits in nonverbal communicative behaviors used for social interaction, ranging, for example, from poorly integrated verbal and nonverbal communication to abnormalities in eye contact and body language or deficits in understanding and use of gestures to a total lack of facial expressions and nonverbal communication.
3. Deficits in developing, maintaining, and understanding relationships, ranging, for example, from difficulties adjusting behavior to suit various social contexts to difficulties in sharing imaginative play or in making friends to absence of interest in peers.

B. Restricted, repetitive patterns of behavior, interests, or activities, as manifested by at least two of the following, currently or by history (examples are illustrative, not exhaustive; see text):

1. Stereotyped or repetitive motor movements, use of objects, or speech (e.g., simple motor stereotypies, lining up toys or flipping objects, echolalia, idiosyncratic phrases).
2. Insistence on sameness, inflexible adherence to routines, or ritualized patterns or verbal nonverbal behavior (e.g., extreme distress at small changes, difficulties with transitions, rigid thinking patterns, greeting rituals, need to take same route or eat food every day).
3. Highly restricted, fixated interests that are abnormal in intensity or focus (e.g., strong attachment to or preoccupation with unusual objects, excessively circumscribed or perseverative interest).
4. Hyper- or hyporeactivity to sensory input or unusual interests in sensory aspects of the environment (e.g., apparent indifference to pain/temperature, adverse response to specific sounds or textures, excessive smelling or touching of objects, visual fascination with lights or movement).

C. Symptoms must be present in the early developmental period (but may not become fully manifest until social demands exceed limited capacities or may be masked by learned strategies in later life).

D. Symptoms cause clinically significant impairment in social, occupational, or other important areas of current functioning.

E. These disturbances are not better explained by intellectual disability (intellectual developmental disorder) or global developmental delay. Intellectual disability and autism spectrum disorder frequently co-occur; to make comorbid diagnoses of autism spectrum disorder and intellectual disability, social communication should be below that expected for general developmental level.

**BIBLIOGRAPHY**

Allely, Clare Sarah, and Larry Dubin. "The Contributory Role of Autism Symptomology in Child Pornography Offending: Why There Is an Urgent Need for Empirical Research in This Area." Journal of Intellectual Disabilities and Offending Behaviour, vol. 9, no. 4, 2018, pp. 129-152.

Blackmore, Charlotte E., et al. "Adults with Autism Spectrum Disorder and the Criminal Justice System: An Investigation of Prevalence of Contact with the Criminal Justice System, Risk Factors and Sex Differences in a Specialist Assessment Service." Autism, vol. 26, no. 8, 2022, pp. 2098-2107, doi:10.1177/13623613221081343.

King, R., & Murphy, D. (2014). Autism behind bars: A systematic review of the research literature and discussion of key issues. Journal of Autism and Developmental Disorders, 44(10), 2717-2733.

Langvik, Eva, et al. "Public Perception of Individuals Who Commit Child Sexual Abuse Material Offences: Exploring the Impact of Demographic Variables and Cross-National Differences." Child Abuse & Neglect, 2024, doi:10.1016/j.chiabu.2024.106799.

Railey, K. S., Love, A. M. A., & Campbell, J. M. (2021). A scoping review of autism spectrum disorder and the criminal justice system. Review Journal of Autism and Developmental Disorders, 8, 118–144.

Robertson, C.E., & McGillivray, J.A. (2013). Autism behind bars: a review of the research literature and discussion of key issues. Journal of Forensic Psychiatry & Psychology, 24(6), 719-737.

Seto, Michael C., et al. "Contact Sexual Offending by Men with Online Sexual Offenses." Sexual Abuse, vol. 23, no. 1, 2011, pp. 124-145, doi:10.1177/1079063210369013.

Seto, Michael C., and Angela W. Eke. "Predicting Recidivism among Adult Male Child Pornography Offenders: Development of the Child Pornography Offender Risk Tool (CPORT)." Law and Human Behavior, vol. 39, no. 4, 2015, pp. 416-429, doi:10.1037/lhb0000128.

Slavny-Cross, R., Allison, C., Griffiths, S., & Baron-Cohen, S. (2022). Autism and the criminal justice system: An analysis of 93 cases. Autism Research, 15(5), 904–914.

Steel, Chad M. S., et al. "Public Perceptions of Child Pornography and Child Pornography Consumers." Archives of Sexual Behavior, vol. 51, no. 2, 6 Jan. 2022, pp. 1173–1185, doi:10.1007/s10508-021-02196-1.

**Donna Lombardo**

---

**Subject:** WEI FU

**From:** Lucien Thomsen <lucien@starhealing.org>
**Sent:** Thursday, July 9, 2026 9:09:36 AM
**To:** Lucien Thomsen <lucien@starhealing.org>; Todd Henry <thenry@thehenryfirm.biz>
**Subject:** Wei Fu

July 9, 2026

Dear Mr. Henry:

Per your request and Mr. Wei Fu's request and consent, I am providing you with this email to summarize my treatment of him with me at STAR. STAR is a comprehensive outpatient treatment program, located in Bryn Mawr PA, which specifically evaluates and treats individuals with problematic sexual behaviors including sexually offensive behaviors.

I am a Licensed Clinical Social Worker in the state of Pennsylvania; a Certified Sex Addiction Therapist-Supervisor; a Certified Multiple Addictions Therapist- Chemical Dependency; and a Certified Sex Offender Treatment Specialist. I am a clinical member of the Association for the Treatment of Sexual Abusers (ATSA); a member of the International Institute for Trauma and Addiction Professionals (IITAP); and a member of the National Association of Forensic Counselors (NAFC).

My assessment of Mr. Fu began on 6/6/2024. As part of the assessment, Mr. Fu completed a number of assessments/questionnaires including:

1. Personality Assessment Inventory (PAI)
2. Hypersexual Behavior Inventory (HBI-19)
3. Sexual Dependency Inventory-Revised (SDI- R 4.0)
4. Young Schema Questionnaire (YSQ L3)

<u>Personality Assessment Inventory (PAI):</u>
The DSM-5 diagnostic possibilities suggested by the configuration of PAI scale scores include:
-Major depressive disorder, single episode, unspecified
-Posttraumatic stress disorder
-Social anxiety disorder (social phobia)

<u>Hypersexual Behavior Inventory (HBI-19):</u>
Mr. Fu’s HBI-19 score of 49 does not indicate elevated levels of hypersexual behaviors.

<u>Sexual Dependency Inventory-Revised (SDI- R 4.0):</u>
The SDI-R 4.0 indicates a negative screen for sexually compulsive/addictive behaviors. The Experiences in Close Relationships-Revised Questionnaire indicates a preoccupied attachment style. Preoccupied people tend to have highly conflictual relationships. Although they are comfortable expressing their emotions, preoccupied individuals often experience a lot of negative emotions, which can often interfere with their relationships.

Young Schema Questionnaire (YSQ L3):
Mr. Fu endorsed a number of statements related to the emotional deprivation and unrelenting standards schemas.

After his initial assessment appointment, we had 21 individual appointments. We addressed concepts from The Road to Freedom 4th Edition written by Jill S. Levenson, PhD and John W. Morin PhD. His treatment goals included the following:

1. accepting responsibility for sex offending
2. understanding sexual behaviors
3. understanding childhood, family, and past adverse experiences
4. victim impact
5. developing relationship and communication skills
6. relapse prevention
7. addressing anxiety/ trauma, depression, and social anxiety symptoms

As part of my work with Mr. Fu, I have reviewed Dr. Alexander Westphal, MD, PhD 5-15-25 psychiatric assessment. Of note, Dr. Westphal states in his report: "*In summary, in Mr. Fu's case, I am confident that with the right support he is at very low risk for recidivism, and that punishment and rehabilitation would be best achieved outside of an institutional environment because of his particular vulnerabilities attributable to autism.*"

During my appointments with him, Mr. Fu reported that his family is supportive of his treatment. There have been no reported concerns from his pre-trial services officer about his supervision of him. Since beginning treatment, he denies engaging in sexually offensive behaviors, alcohol or drug use problems, and/or engaging in anti-social behaviors.

Mr. Fu is amenable to and is responding well to treatment. I believe that with continued therapy he will continue to make progress. I am concerned that Mr. Fu's vulnerabilities may put him at increased risk for being mistreated in prison. I hope his vulnerabilities will be considered for sentencing.

Sincerely,

*Lucien Thomsen, LCSW, CSAT-S, CMAT- CD, CSOTS*
STAR-Sexual Trauma Recovery, Inc.
919 Conestoga Rd Bldg 2 Suite #208
Bryn Mawr, PA 19010
(610) 658-2737 Phone
(610) 658-2739 Fax
*lucien@starhealing.org*

***The contents of this message are privileged and confidential. Any unauthorized disclosure of the information contained within is a violation of state and federal law. Authorized users should use caution when including information.***

07/06/2026

The Honorable Malachy E. Mannion United States District Judge
United States District Court for the Middle District of Pennsylvania
William J. Nealon Fed Bldg. & US courthouse
234 North Washington Avenue Scranton, PA18501

Re: Sentencing of Wei Fu

Dear Judge Mannion,

Your Honor,

I respectfully submit this statement with a clear understanding of the gravity of my offenses and a heavy heart. I now fully recognize that the images I possessed were not mere digital files; they were evidence of real children being abused, whose innocence was stolen. I am devastated by the pain I contributed to. I take full and sole responsibility for my actions, and I carry the weight of that harm every single day.

I came to the United States in 2012 to pursue a Master's degree in Computer Science at Stevens Institute of Technology, driven by the hope of building a better future and honoring my family's dreams. Despite requiring a medical leave for surgery, I graduated in 2014 and built a stable, productive career, working as a Java Developer and subsequently as a Software Engineer at Cox Automotive until my arrest in 2024. I was a contributing member of society, and I never imagined I would one day stand before this Court having caused such profound harm.

However, just months after my arrival in September 2012, I was violently attacked and robbed while walking home from campus. The assault caused a detached retina in my right eye. Over the next five years, I underwent multiple retinal surgeries on both eyes. Despite extensive treatment, my right eye suffers from permanent vision damage and distortion. As a participant in the U-Visa program, I was legally required to remain in the United States to assist law enforcement, but the physical pain, combined with severe, undiagnosed mental health conditions—including Autism Spectrum Disorder, PTSD, and major depression—drove me into profound isolation. I could not regulate my emotions or cope with daily life, and I failed to seek help because I did not understand what was happening to me. That single night in 2012 marked the beginning of a long, silent psychological decline.

Left untreated, my distress manifested as a severe compulsive hoarding disorder. In a misguided, irrational attempt to create a false sense of control and security, I obsessively accumulated physical items. I filled my living space with empty boxes, tools, knives, exercise equipment, firearms, and ammunition. Tragically, this compulsive pathology extended to my digital life. I accumulated harmful digital material alongside the physical clutter, engaging in a mindless, compulsive accumulation rather than confronting the horrific reality of what I was possessing. I failed to see the truth of my actions, and I failed to seek the help I desperately needed.

I do not share this history to make excuses. I share it to provide an explanation of how I failed. The responsibility for my actions is mine alone. When I was arrested in 2024, the life I had built

collapsed. I lost my career at Cox Automotive and the future I had worked so hard to build. But most heartbreaking is the disappointment in my family's eyes. My elderly parents, who should be at peace, have spent the last two years in a foreign country carrying burdens I should have carried for them. I was supposed to take care of them; instead, I gave them worry and shame.

I know that my losses, devastating as they are to me, are absolutely nothing compared to the lifelong trauma inflicted on the innocent victims of this material. That truth haunts me. I do not ask the Court to ignore what I did.

Since my arrest, I have reflected deeply and confronted the darkest parts of myself. For the past two years, I have been in specialized therapy with Dr. Lucien at STAR, focusing on accountability, impulse control, and understanding the real-world devastation of this material. I am actively developing the psychological skills I previously lacked to ensure I never reoffend. Furthermore, I have returned to my Buddhist faith, practicing daily meditation, copying sutras by hand, and engaging in repentance. These practices have provided a framework for moral reflection that was absent from my life for far too long.

My family has stood by me with unwavering support—not because they excuse what I did, but because they believe I can change. Over the past two years, I have maintained strict compliance with the conditions of my release and remained completely offense-free. I want to prove that my family's belief, and this Court's leniency, would not be misplaced.

I do not presume to ask for forgiveness, as I am not sure I deserve it. I only humbly ask that the Court consider my profound remorse, my intensive rehabilitation, and the psychological context of my decline when determining my sentence. I ask for the opportunity to continue proving, through my actions, that I can live a responsible, law-abiding life under whatever conditions this Court deems appropriate. I have learned the hardest lesson of my life, and I am committed to doing the work required to ensure I never cause harm again.

Thank you for your time, your careful consideration, and your service to the Court.

Respectfully submitted,

Wei Fu

07/02/2026

The Honorable Malachy E. Mannion United States District Judge
United States District Court for the Middle District of Pennsylvania]
William J. Nealon Fed Bldg. & US courthouse
234 North Washington Avenue
Scranton, PA18501

Re: Sentencing of Wei Fu

Dear Judge Mannion,

I respectfully submit this letter in support of Wei Wu, who is scheduled to be sentenced before the Court.

My name is Yang Jiang, and I have been working as a Lead Software Engineer at Wells Fargo Bank for the past 18 years. I am married and the mother of two children. For more than 20 years, I have been an active member of my church community and have regularly volunteered in church and community service. Last year alone, I devoted more than 100 hours to volunteer work through church outreach and support programs. I share this background so the Court may understand the perspective from which I write and the importance I place on honesty, integrity, compassion, and personal responsibility.

I have known Wei for approximately 36 years. Although he is my second cousin, our families have remained close throughout our lives. We have stayed connected through family gatherings, holiday visits, and regular conversations, giving me the opportunity to know him well over many years. Based on that relationship, I believe I can offer the Court an honest assessment of his character.

Throughout my life, I have known Wei to be a thoughtful, dependable, and genuinely caring person. He has always treated others with kindness and respect, often expressing his concern through quiet acts of service rather than words. He is not someone who seeks attention or recognition, but he has consistently shown a willingness to help those around him whenever he is able.

Over the years, I have also come to understand the significant challenges Wei faces as a result of Autism Spectrum Disorder. His autism affects the way he interprets social situations, communicates with others, and processes information. In addition, the violent assault he suffered in 2012 left him with permanent vision impairment and lasting emotional trauma. While these hardships do not excuse his conduct, they have profoundly shaped the difficulties he has faced throughout his adult life and help explain why he is an especially vulnerable individual.

One experience, in particular, has remained with me over the years. Many years ago, my father in China was diagnosed with pancreatic cancer. As the only child in my family, I was unable to return to China because of personal circumstances. Wei happened to be in China at the time. At a time when he was facing significant personal challenges of his own, he

nevertheless devoted countless hours to researching my father's illness, shared information and encouragement with my mother and me, and even traveled to another city in an effort to help connect my father with an experienced physician. He did all of this without being asked and without expecting anything in return.

During one of the most stressful periods of my life, Wei's kindness brought tremendous comfort to my family. His willingness to invest so much time and effort while dealing with his own personal challenges demonstrated a level of compassion and selflessness that I have never forgotten. This experience is why I continue to believe that the offense before the Court does not represent the person I have known for more than three decades.

Learning about the offense came as a great shock to me. I understand the seriousness of what occurred and the impact it has had on others, and I do not seek to minimize the gravity of his actions. At the same time, I have also witnessed Wei accept responsibility for his actions with genuine remorse. He has never attempted to shift blame to his autism, his visual impairment, or the trauma he experienced. Instead, he has acknowledged the seriousness of his conduct and has committed himself to meaningful change.

Over the past 28 months, I have seen Wei make a sincere commitment to improving his mental health. He has remained engaged in ongoing therapy to address the lasting effects of his trauma, depression, and Autism Spectrum Disorder. In my view, he has approached this process with honesty, humility, and determination. I believe he is doing the difficult work necessary to understand his past, improve his judgment, and reduce the risk of making similar mistakes in the future.

I respectfully ask the Court to consider the whole person I have known for the past 36 years, in addition to the offense for which he now stands before the Court. I believe Wei's acceptance of responsibility, his genuine remorse, his commitment to treatment, and the compassion he has consistently shown to others demonstrate that he has the capacity for continued rehabilitation. I respectfully hope the Court will consider these factors in determining a fair and compassionate sentence.

Thank you for your time, consideration, and attention to this letter.

Respectfully submitted,

Yang Jiang
9619 Belmont Ln
Waxhaw, NC 28173
704-296-7252
jiangy03@yahoo.com

07/07/2026

The Honorable Malachy E. Mannion United States District Judge
United States District Court for the Middle District of Pennsylvania]
William J. Nealon Fed Bldg. & US courthouse
234 North Washington Avenue
Scranton, PA18501

Re: Sentencing of Wei Fu

Dear Judge Mannion,

I am writing this letter in support of Wei Fu, who is scheduled to be sentenced before this Court.

My name is Yun Ling. I am employed as a Lead Specialty Software Engineer with Wells Fargo in Charlotte, North Carolina. I am married and the father of two children. I have always believed in giving back to my community and volunteer at my children's school whenever I am able.

I have known Wei for more than 25 years. Although he is my wife's second cousin, our families have maintained a close and enduring relationship. For the past many years, I have had the opportunity to spend time with him during family gatherings and holiday visits. Because of our longstanding relationship, I have had many opportunities to observe Wei's character and the way he interacts with others.

Throughout the years I have known him, I have found Wei to be a kind, dependable, and considerate person who consistently treats others with respect. While he has always been somewhat quiet and socially reserved, I have never known him to be unkind or intentionally hurtful. Instead, I have seen someone who genuinely cares about the well-being of those around him.

Wei has been diagnosed with Autism Spectrum Disorder (ASD), which affects how he processes information, interprets social situations, and communicates with others. Over the years, I have observed many of these challenges firsthand. He often takes language very literally, struggles in unfamiliar social situations, and becomes intensely focused on particular interests. These difficulties have made everyday interactions much more challenging for him than most people realize.

In addition to living with autism, Wei experienced a traumatic assault in 2012 while returning home from university. During the attack, he suffered a detached retina that permanently impaired the vision in his right eye and left him with significant visual distortion. Beyond the lasting physical injury, the assault had a profound emotional impact. From my perspective, these combined challenges have made daily life considerably more difficult and have left him especially vulnerable.

Despite these hardships, I have consistently known Wei to be thoughtful and generous toward our family. When my children were young, he would happily spend time playing with them whenever he visited our home. He was patient with them, and they always looked forward to seeing him. Wei also enjoys cooking and often prepared meals for our family during his visits. His braised chicken wings quickly became a family favorite, and even today my children remember him as the uncle who always made delicious food. Whenever we visited him, he would thoughtfully plan places for us to see and take us to local restaurants that he thought we would enjoy. These may seem like small gestures, but they reflect the kind of person I have always known him to be—someone who naturally expresses kindness through caring for others.

When I learned about the offense in this case, I was deeply saddened. I fully recognize the seriousness of the conduct and the harm it has caused. At the same time, I do not believe this offense reflects the person I have known for more than two decades.

Throughout this legal process, I have seen Wei accept responsibility for his actions without attempting to excuse or justify them. He has expressed genuine remorse and understands the seriousness of what occurred. Rather than avoiding accountability, he has committed himself to addressing the underlying issues that contributed to his poor judgment.

For the past 28 months, Wei has remained actively engaged in intensive mental health treatment. He has consistently attended therapy to address the effects of his past trauma, depression, anxiety, and Autism Spectrum Disorder. From what I have observed, he has approached this treatment with sincerity and determination. He has worked hard to better understand himself and build the insight and coping skills necessary to prevent similar conduct in the future.

I respectfully ask the Court to consider not only the offense before it, but also the person I have come to know over the past 25 years. Wei is a genuinely vulnerable individual whose life has been shaped by autism, permanent vision loss, and significant psychological trauma. I believe his sincere remorse, acceptance of responsibility, and unwavering commitment to treatment demonstrate that he is capable of continued rehabilitation and of living as a safe and productive member of society.

Thank you for your time and thoughtful consideration of this letter.

Respectfully submitted,

Yun Ling
9619 Belmont Ln, Waxhaw, NC 28173
704-287-7068
lingy03@yahoo.com